# THE TAXICAB COMPANY OF BALTIMORE CITY

*vs.*

## LESTER H. EMANUEL, THROUGH HIS FATHER AND NEXT FRIEND SOLOMON H. EMANUEL.

*Removals: right of—; joint defendants; all must petition. Actions for damages through negligence; what must be proved. Automobiles: excessive speed; contributory negligence. Prayers: taking case from jury; "no evidence." Injuries subsequent to accident.*

To entitle a plaintiff to recover in a suit for damages because of injuries received through the alleged negligence of the defendant, there must be some act of negligence, either of commission or omission, on the part of the defendant or its servant, and evidence that such negligence was the cause of such injury, and the burden of proof is on the plaintiff.        p. 256

In an action for damages for injuries alleged to have been received by the plaintiff, by being hit by the defendant's automobile, evidence that the automobile was going at an excessive speed, is evidence legally sufficient to submit to the jury in determining the question of negligence.         p. 259

A prayer, seeking to take a case from the jury for the want of legally sufficient evidence, should not be granted, if there is any evidence, however slight, that is competent, pertinent, and coming from a legal source, and tending to prove the plaintiff's case.                                        p. 259

But the weight and value of such evidence are for the jury to determine. p. 259

. To establish contributory negligence, as a matter of law, the act relied on must be distinct, prominent and decisive, and one about which ordinary minds would not differ. p. 259

Where the nature and attributes of the act relied on to show contributory negligence can only be correctly determined by considering all the attending circumstances, it is for the jury, and not for the Court to pass upon and characterize it.

pp. 259-260

It does not follow that because a plaintiff, in a suit for damages for injuries received from an automobile, could have avoided the accident, that he is guilty of contributory negligence; in such a case, to make him guilty of contributory negligence, it must be shown that he knew of the car's approach in time, or by the use of reasonable diligence *should* have known *it in time,* to have avoided the accident. p. 262

In an action for damages for injuries received, if there is evidence that additional injuries were occasioned afterwards by the treatment the plaintiff received in the hospital to which he went, and that the plaintiff might have avoided such additional injuries by the use of ordinary care, he is not entitled to recover for such additional injuries. p. 262

The term "party," as used in the Constitution, Article 4, section 8, and in the Act of 1868, Chapter 180, regarding the right of removal in civil cases, must be taken collectively, where there are more persons than one, as plaintiffs or defendants, and such application must be made in behalf of all the persons constituting the party plaintiffs or party defendants; the right does not reside in each of the plaintiffs or defendants. p. 265

After the jury has been sworn it is too late to exercise the right of removal. p. 265

*Decided February 17th, 1915.*

Appeal from the Baltimore City Court. (SOPER, C. J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Albert C. Ritchie* and *Robinson Griswold* (with whom were *Stuart S. Janney* and *W. Howard Hamilton* on the brief), for the appellant.

*Michael P. Kehoe* and *James J. Lindsay,* for the appellee.

PATTISON, J., delivered the opinian of the Court.

In this case an infant, Lester H. Emanuel, recovered a judgment against the defendant, The Taxicab Company of Baltimore City, in the Court below, for personal injuries suffered by him, alleged to have been sustained by the carelessness and negligence of the defendant's agent in operating an automobile belonging to the defendant, on the 12th day of September, 1913, upon Greenmount avenue, or York road, near Windermere avenue, or Thirty-fourth street, in the City of Baltimore.

There are in the record three bills of exceptions, two to the rulings of the Court upon the admission of testimony, these however, are waived, and one to the ruling of the Court upon the prayers. In addition to this exception, we are asked to review the ruling of the Court in refusing to grant the defendant's application for a removal of the case.

Among the prayers offered by the defendant were three that asked for a verdict for the defendant; the first and third because of a want of legally sufficient evidence entitling the plaintiff to recover, and the second because of the alleged negligence of the plaintiff directly contributing to the accident complained of. We will first consider the ruling of the

Court in refusing to grant these prayers, and to do so it will be necessary for us to state fully the testimony in the case.

The street upon which the accident happened is named in the declaration as Greenmount avenue, although it is generally spoken of in the testimony as York road. It runs north and south and upon it are the tracks of the City Passenger Railway Company. The width of said street is thirty-nine feet and seven inches between the curbs; the distance between the curb on each side of the street and the tracks of the railway company is twelve feet and two inches, with a distance of four feet and five inches between the tracks. Windermere avenue, thirty-two feet in width between its curbs, intersects York road from the east, but does not cross it. Calvin avenue intersects York road from the west, the southern line of which is about one hundred and ten feet north of Windemere avenue. About ten feet north of what would be the north line of Windermere avenue, if it were extended beyond York road, is an alley, ten feet in width, intersecting York road from the west, but not extending beyond it. Ethelwood lane, the next street above Calvin avenue, is three hundred and seventy-six feet north of Windermere avenue. The streets south of Windermere avenue are Henderson and Thirty-third streets, the former about one hundred and fifty feet and the latter about three hundred and ninety feet from said avenue.

The plaintiff, an infant sixteen years of age at the time of the accident, residing with his father on the north side of Calvin avenue, was injured while attempting to cross in a northwestern direction from the east side of York road, at a point near the middle of Windermere avenue, to the west side of said road at a point where it is interested by the aforesaid alley.

The automobile of the defendant, at such time, was coming south on the west side of York road—its lights were not burning, nor were the street lamps lighted at the time.

The plaintiff testified that he, on the evening of the accident

took a street car at Holliday and Fayette streets for his home on Calvin avenue; that when the car reached Twenty-fifth street he noticed, by the clock in front of the drug store, that it was quarter of seven, and that he had frequently observed that it took five minutes for the car to go from this point to Calvin avenue, and thus he fixed the time of his reaching Windermere avenue at ten minutes of seven, and he says it was then cloudy and getting dark; that he alighted from the front step of the car at a point about the middle of Windermere avenue and remained at this point until the car reached a point, where he saw it, a block away, between Calvin avenue and Ethelwood lane; that he looked twice up Windermere avenue and twice up and down York road before starting to cross the last-named street, and saw nothing coming, and "before he got across to the other curb the automobile struck him;" that when struck he was in the act of stepping from the south-bound track; that he did not see the automobile at all before it struck him; that Mr. Hull, the driver of the automobile, came back and put him in the automobile and took him to the Hebrew Hospital. Upon cross-examination he testified that while crossing the street he again looked up York road, but saw no automobile or other vehicle, except the street car, and that had there been any he would have seen it, as there was nothing to obstruct his view; that he had no difficulty in seeing the street car between Calvin avenue and Ethelwood lane.

William D. Burnite, a witness for the plaintiff, testified that he lived on the south side of Windermere avenue seventy-five or eighty feet east of York road; that he saw the boy start across the street, facing towards the alley, "and the automobile come down and hit him;" that it was in the evening about seven o'clock and was cloudy and getting dark, he at the time was seated on his porch; that the boy started across the street and was nearly over, just crossing the south-bound track, when the automobile struck him; that when he started across the street, the car was out of sight; that he

did not hear any gong rung or horn blown preceding the accident; that "he could not say how fast the automobile was going, but they went about two hundred feet after the fellow put the brakes on; that he could tell when they put the brakes on by the way the automobile started to screech; that he heard this screeching about the same time the automobile struck the boy; that the accident happened about a minute or a little over, after the boy got off the car; that he first saw the automobile when it hit the boy, or rather about two seconds before it hit him, right at the time it hit him; that he did not see the automobile approaching and simply saw the contact, the accident, it was going pretty fast, he could not say how fast."

Robert Woods, produced by the plaintiff, testified that at the time of the accident he was standing on the York road in front of Mr. Lacey's feed store, near the north corner of Henderson street; that he saw the plaintiff get off of the car and after the car had passed some distance up the street, saw him start across the street "kind of on a bias, with his face towards the alley;" that it was cloudy and getting dark; "that at the time the boy started to cross the street he did not see any street cars or carriages or automobiles on York road; that the boy was on the south-bound track going across when the automobile struck him; *that when he first saw the automobile it was up by Calvin avenue and the boy was, he guessed, about middle way of the street; that the automobile was coming real fast;* that he thought the boy could get across before it hit him; that the left side of the automobile hit the boy, and that after it struck him it went on down in front of Gunning's store at the south side of Henderson street." That he had no difficulty in seeing the automobile at Calvin avenue, as there were no other vehicles on the streets and that there was nothing between the plaintiff and the automobile to prevent him, while crossing the street, from seeing it.

Frank Blair, when called by the plaintiff, testified that he was at the time of the accident on York road, in front of

Windermere avenue, that when the car was between Calvin avenue and Ethelwood lane the plaintiff started to cross the track, and was between the two tracks when the automobile struck him; that the automobile was coming towards the city, and it was the front of the automobile that struck him; it then came down as far as Henderson street and stopped; that he "didn't hear any horn blown or noise of any kind."

Benjamin Williams, plaintiff's witness, testified that he was at the time of the accident with Blair in front of Windermere avenue on the west side of York road; that after the car from which the boy had alighted passed he saw him standing on Windermere avenue, about middle way of said avenue, back from the track about five feet, and when he started to cross, the car was about Calvin avenue, somewhere near Ethelwood lane; that "the boy was walking at a pretty good gait, he seemed like he was in a hurry going home," that it was getting dark; that he saw the machine when it passed Calvin avenue, he saw it on account of the lights in the store; that then he never paid much attention to it, didn't know whether the machine had stopped; that in that time the boy started to cross the street, and when the machine was about two feet from him he heard somebody holler, "Hey, look out;" the boy was then coming across the street, and he kind of turned like that (indicating), and just as he turned to get out of the way the machine struck him and knocked him over; that the left-hand side of the machine struck the boy; "that he heard no noise or anything until he heard this shout; that the boy was walking across the street kind of catercornered, toward home;" that he was only about eight feet from the boy when the accident happened; that at the time the boy started to cross he, the witness, "didn't see any street cars or buggies or wagons or automobiles either coming up or going down; that after he saw the car pass the store he did not see any more then until the automobile struck the boy;" that when he saw the automobile it was "right at the corner of Calvin avenue, that it could not have come out

of Calvin avenue because I seen it when it was passing the store," which was above Calvin avenue. Upon cross-examination he testified that he could not say whether the lights were burning in the car; that he did not have any trouble seeing the automobile when it passed the store above Calvin avenue.

Eva Emanuel, sister of the plaintiff, who was at the time fourteen years of age, testified that she was between Gorsuch avenue and Thirty-third street when her brother passed her in the car, and she walked up a little faster to meet him when he got off; she saw the car stop at Windermere avenue, as it had its lights burning; she was then at the drug store at the northwest corner of Thirty-third street and York road; she had no difficulty in seeing this distance; she saw her brother after the car had passed standing on the east side of the street, at that time she was almost to Gunning's; that he, after looking carefully to see if any vehicles were coming, started across the street, and the next thing she saw, he was knocked down; that she did not even see the machine coming and saw it just as it knocked him down; that she was then between Lacey's and Gunning's.

Fred G. Kitchen, who was at the time of the accident an employee of the defendant company, but not in its service at the time of the trial, testified that on the night of the accident he had a conversation with Eva Emanuel at the company's garage; that he asked the little girl if she had seen the accident, and she said she had, that she saw her brother get off the street car and run behind it to get across the street; that she yelled to him and he stopped, and if he had stayed still the car would not have struck him, but he started a second time and the car struck him and knocked him down. This conversation to which he testified, however, was denied by Eva Emanuel when upon the stand. This witness was a defendant to the suit, but at the conclusion of the case a prayer was granted taking the case from the jury so far as he was concerned.

George E. Hull, called to the stand by the defendant, testified that he was in the employ of the defendant taxicab company on September 12th, 1913, and was at the time of the accident driving the automobile of the defendant, that he turned into Greenmount avenue from Holman avenue; "that Holman avenue is at least a mile north of Ethelwood lane, and he came straight on down the York road; that as he approached Windermere avenue he saw a street car coming north; that the first he saw of Lester Emanuel was when he came from behind the car, which had started, and he was on his way across the street; that he did not see him get off the car; that it was then between six and seven o'clock, and you could tell the evening had started; that he did not have any trouble in distinguishing any objects within a reasonable range any more than you would in the day time, except you have a condition that is between daylight and dark; that when Lester Emanuel came from behind the car, the car had started off, and the front of the automobile did not vary five feet from where the motorman stands on the north-bound car; that the front platform of the car was then nearer to the northern boundary of Windermere avenue than to the southern boundary; that he would not say he was directly abreast of the motorman, it was hard to state exactly, as he remembered coming to the car and seeing the boy just about the same time; that the front wheels of the automobile were at the front or near the front of the car; that at that time Lester Emanuel came from behind the car and started across the street; that he did not go across on a straight line, but in a direction generally west by north, "and as he came from behind the car and when he was first seen by the witness, he hollered to him and "at the same time he, the witness, reached over, threw out his clutch, and reached down to throw out his gear, and throw on his brake;" that the boy then stopped between the north and south-bound tracks, and seeing this "he relaxed and let in his clutch and left his gear alone and kept on ahead;" that "when the boy stopped

he thought that was a signal for him to go on, that he had
the right of way; that after the boy started up again, after
stopping, he, the boy, hurried across, that is, he tried to get
across; it was then that he was struck." He was then asked
"after he left his position between the tracks and started
hurriedly across the street, could you have avoided the acci-
dent? A. No, sir." That "the boy was hit by the left side
of the front of the car; that the boy ran into the car, the
car did not run into him; that after Emanuel ran into the
automobile he could not place exactly where the car stopped,
but it stopped without damage, as he took the time to throw
off the gear and stop with his foot brake, he turned on his
emergency brake and held the car from moving; that he
did not put on his emergency brake before he stopped because
he did not realize the boy was going to be struck; that he
first knew the boy had run into the car when he heard the
crash;" that after the accident he got out of his car and went
back and found the boy's leg broken and he took him and put
him in the automobile, and upon the suggestion of his little
sister, took him to the Hebrew Hospital. Upon cross-exam-
ination he testified that he had not lighted the lamps on his
machine before the accident; that he lighted them afterwards
at Gorsuch avenue, five or six blocks away; that "he was
coming down right on the right-hand side of the road, on
the side that is provided for vehicles; that he was not run-
ning on the car tracks, but was on the west side of the car
tracks; that the distance from the most eastern side of the
automobile to the most western rail of the western track was
about that much (indicating approximately three feet, six
inches); that when he first saw the boy he was in motion,
walking, and after the boy stopped and they started on again,
he had a hurried gait, a gait one would assume in getting
across in front of a moving vehicle; that he could not say
what the speed of the machine was, but was an average city
or suburban speed with a clear road."

Valentine Wyroba, produced by the defendant, testified
that he also worked for the defendant company and was in

the automobile with the witness Hull; that when he first saw the boy he was coming from behind the car, about ten feet from the automobile; that he was going across the street, and both he and Hull hollered to him and he stopped and then went on again and then they struck him; that the street car passed them a couple of seconds before the automobile struck the boy; that the automobile was going about 10 miles an hour.

To entitle the plaintiff to recover there must be some act of negligence, either of commission or omission, on the part of the defendant or its servant, and it is necessary that there be some evidence indicative of negligence in the circumstances surrounding the occurrence, either antecedent to, or coincident with the happening of the accident, and the burden is upon the plaintiff to show such negligence. *Havermale* v. *Houch,* 122 Md. 87; *Schier* v. *Wehner,* 116 Md. 554.

In our opinion there is found in the facts stated evidence legally sufficient to be submitted to the jury tending to show negligence on the part of the defendant in operating its automobile at an excessive rate of speed.

The witness Woods in his testimony stated that the boy was on the south bound track going across when the automobile struck him; that when he first saw the automobile it was up by Calvin avenue and the boy was then, he thought, about the middle way of the street; that he thought the boy had time to get across, but the automobile was coming real fast.

The point at which the boy started to cross the street was about midway between the north and south curbs of Windermere avenue, and near the east curb line of York road, and the course he took in crossing the street was in the direction of the alley above referred to, only about ten feet above the north line of Windermere avenue if it were extended across York road. The entire distance he was to go would not exceed sixty feet, as shown by the survey and plat made and furnished by the defendant, which the reporter is asked to insert in the report of this case. If the plaintiff was in the

THIRTY-FIFTH STREET
OR
ETHELWOOD LANE

STORE

CALVIN AVENUE

ALLEY

THIRTY-FOURTH STREET
OR
WINDERMERE AVENUE

FISCHER'S

LACEY'S
ALLEY
LACEY'S
LACEY'S

HENDERSON STREET

GUNNING'S

"A" indicates the point from which the
Plaintiff started to cross York Road
The Diagonal line indicates the direction
in which he crossed
"C" indicates the point of the accident

Distance from Drug Store at Northwest
corner of Thirty-third Street and York
Road to "A" is 420 feet, more or less

Distance from Lacey's Store to Store beyond
Northwest corner of Calvin Street and
York Road is 360 feet, more or less.

Distance from point on West side of York
Road, opposite Fischers Store, to Store
beyond Northwest corner of Calvin Street
and York Road is 265 feet, more or less.

Distance from "B" to Store beyond
Northwest corner of Calvin Street and
York Road is 205 feet, more or less

The width of all streets except York Road
is from building line to building line.

DRUG STORE

THIRTY-THIRD                 STREET

middle of York road, as stated by the witness, he was be-
tween the north and south bound tracks of the railway com-
pany, at the point B. on the plat, only about twelve feet from
the place of the accident, when, as the witness Woods says,
the automobile was at Calvin avenue. If it was at the center
of the avenue it was at least one hundred and forty feet from
the place of the accident, or if the witness saw it at the store
at or near the north corner of Calvin avenue, where it was
first seen by the witness Williams, it was one hundred and
ninety-five feet from the place of the accident.

The statute, sec. 144, Art. 56 of the Code, provides that
"if the rate of speed of a motor vehicle operated upon the
highways of this State exceeds twelve miles an hour in the
thickly settled or business part of cities, town or villages, or
eighteen miles an hour in the outlying or not thickly settled
parts of cities, towns, or villages, such rate of speed shall be
*prima facie* evidence that the party operating such vehicle
is operating the same at a rate of speed greater than is rea-
sonable and proper, and in violation of the provisions of this
section, and the burden of proof shall be upon him to show
that such rate of speed was not greater than was reasonable
and proper, as above set forth."

If the automobile was at the middle of Calvin avenue and
was going eighteen miles an hour, it would take about six
seconds to reach the place of the accident, and if it was at
said store, it would have taken about seven and one-half sec-
onds to have reached the place of the accident. Williams
stated that "the boy was walking at a pretty good gait, he
seemed like he was in a hurry going home." At an ordinary
gait it should not have taken the plaintiff so long as six sec-
onds to have walked the twelve feet, the point at which the
automobile struck him, and certainly not so long if his gait
was a hurried one, as described by Williams. Therefore, it
would seem that the automobile ran at a greater speed than
eighteen miles an hour in reaching the point of the accident
at the time that it did.

We have also the evidence of Williams who stated that at the time the boy started to cross he, the witness, did not see any street cars or buggies or wagons or automobiles. How far the boy had advanced in crossing the street at the time he saw the automobile he does not say, but at the time he saw it it was at least one hundred and ninety-five feet from the place of the accident, and the boy was on his way across.

We think this evidence, together with the evidence of Burnite as to the speed of the car, was legally sufficient to go to the jury tending to show an excessive rate of speed at which the automobile was running.

A prayer seeking to take a case from the jury for the want of legally sufficient evidence will not be granted, if there is any evidence, however slight, legally sufficient as tending to prove it, that is to say, competent, pertinent and coming from a legal source, but the weight and value of such evidence will be left to the jury. *Poe's Practice,* p. 317, sec. 295; *Moyer* v. *Justis,* 112 Md. 220; *M'Elderry* v. *Flannagan,* 1 H. & G. 308; *Leopard* v. *Ches. & Ohio Canal Co.,* 1 G. 222; *Jones* v. *Jones,* 45 Md. 154; *Mallette* v. *British Ass. Co.,* 91 Md. 481.

We are now to consider the defendant's second prayer by which the Court was asked to instruct the jury "that from the uncontradicted evidence in this case the plaintiff was guilty of negligence directly contributing to the act complained of, and therefore their verdict must be for the defendant."

In considering this prayer we must inquire whether the facts justify the Court in holding as a matter of law that a recovery cannot be had because the plaintiff was guilty of contributory negligence. The truth of the evidence adduced by the plaintiff must be assumed in dealing with this question and all legitimate inference deducible from that evidence must be conceded.

The act relied on to establish as a matter of law the existence of contributory negligence must be distinct, prominent and decisive, and one about which ordinary minds would not differ in declaring it to be negligent. Where the nature and

attributes of an act relied on to show negligence contributing
to an injury sustained can only be determined correctly by
considering all the attending and surrounding circumstances
of the transaction, it falls within the province of the jury
to pass upon and characterize it, and it is not for the Court
to determine its quality as matter of law.   *B. & O. R. R.
Co.* v. *Hendricks,* 104 Md. 84; *Cooke* v. *Traction Co.,* 80 Md.
558, and cases cited in the opinion in the latter case.

The plaintiff testified that before crossing he looked both
up and down the street and again looked while crossing the
street, but did not see any vehicle upon the street and did
not see the automobile until after it struck him.

It is urged by the defendant that he did not look as he
says he did, for had he done so he could have seen the auto-
mobile and have avoided the accident, as there were no
obstructions upon the street to prevent him from seeing it.

It will be borne in mind that a number of witnesses stated
that it was cloudy and growing dark at the time of the acci-
dent.   It was also stated in evidence that at this time the
lights in the street car were burning, as well as those in
some of the stores upon York road.   It was by reason of the
lights in the store above Calvin avenue that Williams first
saw the automobile in front of said store, and he never saw it
again until about the time it struck the boy.   These facts in
themselves corroborate the testimony of those witnesses who
stated that it was growing dark.   It is true the plaintiff
stated that he saw the street car a block or more away before
attempting to cross the street, but it will be remembered
that this car was lighted, and for that reason it could have
been much more easily seen than an object that distance away
not lighted, and it is a conceded fact that the automobile
was of a dark color and that its lights were not burning.

The sister of the plaintiff, while at or near Gunning's,
and Burnite, while upon his porch on the south side of Win-
dermere avenue seventy-five feet east of York road, saw the
plaintiff after he had alighted from the car and as he started
on his way across the street, but the condition as to light at

this point, which was near the store of Fischer, on the corner of Windermere avenue, may have been very different from the conditions at other points on York road between Calvin avenue and Windermere avenue. It is not said whether the lights in Fischer's store were or were not burning at that time. If they were, they would have shone upon the plaintiff, enabling his sister and Burnite to have seen him as they stated.

The sister, like the plaintiff, never saw the automobile until it struck him, and Williams, it seems, saw the automobile only as it was passing Calvin avenue where the lights shined out upon it; he never saw it again until about the time it struck the boy. This is true of all others who saw it; that is, they saw it first at Calvin avenue and never saw it again until about the time it struck the boy. Woods says when he first saw it at Calvin avenue, the plaintiff was then in about the middle of the street, and therefore had he, the plaintiff, looked up the street before such time he probably would not have seen the automobile; and thus it may be that he looked up the street before crossing it and then again while crossing it, but before he reached the middle of the street. It may have been that just at the time the automobile passed the store at Calvin avenue, where he could have seen it, or at least where the other witnesses saw it, he was not looking in that direction, and we cannot say that because he was not at all times, while crossing the street, looking in such direction, when it was equally as important for him to look in the opposite direction, that he was guilty of contributory negligence. If he looked, as he said he did, before starting to cross the street, he would not have seen the automobile, if Williams is to be believed, for Williams says at that time the automobile was not in sight.

We can not say from the testimony in this case that the plaintiff was, as a matter of law, guilty of contributory negligence. The question of contributory negligence should have been left to the jury upon the testimony adduced.

The defendant's fourth prayer was, in our opinion, properly refused. It asked the Court to instruct the jury that "if the plaintiff knew, or by the use of reasonable diligence might have known of the approach of the automobile, and thereby have avoided the danger, then their verdict must be for the defendant."

It would not follow that because he knew of its approach he could have avoided the accident, for he may have learned of its approach too late to have avoided it. It was not only necessary that he should have known, or by the use of reasonable diligence could have known of its approach, but that he should have known of it *in time* to have avoided the accident.

And we find no error in the action of the Court in refusing the fifth and eighth prayers of the defendant, in view of the facts as disclosed by the record.

We think the learned Court below committed no error in refusing the defendant's eleventh prayer. The law as to damages applicable to this case was, in our opinion, properly presented to the jury by the plaintiff's third prayer as modified by the Court. Without setting out and discussing the evidence as to the character of the injuries received by the plaintiff, we will content ourselves by saying that there was evidence tending to show injuries of a permanent character legally sufficient to go to the jury to be considered by it. The prayer as modified instructed the jury that if they found that the plaintiff had suffered additional damage by the breaking of his leg in the hospital after the collision, and that he might have avoided the second breaking by the use of ordinary care and diligence, then he is not entitled to compensation for such additional damage. This, we think, properly stated the law upon this feature of the case.

In the case of the *City of Goshen* v. *England* (Ind.), 5 L. R. A. 259, similar in many respects to the case now before us, the instruction there given, which was approved by the Supreme Court of Indiana, stated in effect that the plaintiff was not entitled to recover for any pain, anguish or deformity produced by her negligence in the treatment

of the limb.   That if she by her negligence in the treatment
of the limb had increased the pain, suffering and deformity,
she could not recover for such increased pain, suffering and
deformity produced by her own negligence.

The first and second prayers of the plaintiff are identical
in form with the first and second prayers in each of the cases
of the *B. & O. R. R. Co.* v. *Trainor,* 33 Md. 542, and *Winner*
v. *Linton,* 120 Md. 280, and which had the approval of this
Court in those cases.   In the latter case the suit was insti-
tuted to recover for personal injuries sustained by the plain-
tiff in being struck, knocked down and run over by the auto-
mobile of the defendant while upon one of the public streets
of the City of Baltimore, under circumstances somewhat
similar to those found in this case, and with one exception
the objections urged against these prayers in this case were
made against the prayers in that case.

It is urged in the case before us that there is an inconsist-
ency in the two prayers.   This inconsistenry, however, we
think is more apparent than real.   In the first prayer, to
enable the jury to find for the plaintiff, they were to find, in
effect, *"that on or about the 12th day of September,* 1913,
*the infant plaintiff was injured by an automobile in the
possession and control of the defendant while operated by
George Hull, an employee of said defendant, on Greenmount
avenue, a public thoroughfare of Baltimore City, at or near
its intersection with Windermere street,"* and that the injury
resulting from a want of ordinary care and prudence on the
part of said employee, and not from a want of ordinary care
and prudence on the part of the plaintiff.

And in the second prayer they were instructed, in effect,
that even if they found a want of ordinary care and prudence
on the part of the plaintiff, yet if they further found that its
employee had used ordinary prudence and care in the man-
agement, control and operation of the automobile the acci-
dent could not have occurred, then the plaintiff was entitled
to recover, "provided they find the *other* facts set out in the
first instruction."

The alleged inconsistency complained of is that in the second instruction the jury was to find as in the first prayer that the injury did not result from a want of ordinary care and prudence on the part of the plaintiff, and were also to find that the plaintiff was guilty of a want of ordinary care and prudence.   This is not the meaning of the second prayer, and the jury we think would not so understand it.   The jury in the second prayer were to find that the plaintiff was guilty of a want of ordinary care and prudence and were not to find, as in the first prayer, that he acted with ordinary care and prudence, and it was because they were not to so find that they were limited in their finding to the "*other* facts set out in the first instruction."   The concluding words of the second prayer—"provided they find the *other* facts set out in the first instruction"—were taken *verbatim* from the second prayer in each of the two cases above cited, which as we have said, were approved in those cases, although granted, with a prayer identical with the first prayer in this case.   The Court we think was correct in its ruling upon the special exceptions thereto and in granting these prayers.

The remaining question presented by this appeal, is upon the action of the Court in refusing the application of the defendant, The Taxicab Company, to remove the case to some other Court for trial.

The suggestion of removal and affidavit thereto was filed with the clerk of the Court on the day of the trial and before the case was called for trial.   But the plaintiff interposed objection to the removal of the case upon the ground that the other defendant to the suit, Fred. G. Kitchens, had not joined in the suggestion and affidavit of removal.   At such time said defendant was not in Court, but his counsel who was present stated that his client would join therein when he appeared in Court.   The Court however refused to remove the case upon this offer and proceeded with the trial of the case.   After the jury had been sworn the defendant Kitchens appeared in Court and announced his willingness to join in the suggestion and affidavit of removal, but the

Court held, that it was then too late for him to exercise the right of removal and proceeded with the trial of the case.

Our predecessors held in the case of *State* v. *Gore,* 32 Md. 498, that the term "party" as employed in the Constitution, Art. 4, sec. 8, and the Act of 1868, Chapter 180, to regulate and give force to the constitutional provision, when applied to civil causes must be taken in a collective and representative sense where there are more persons than one as plaintiffs or defendants, and, therefore, as there can be no severance, all applications to remove in such cases must be taken as made on behalf of all persons constituting the party-plaintiffs or defendants as the case may be.

In the latter case of *Baltimore County* v. *United Rys. Co.,* 99 Md. 87, it was said, "the cases in this Court and in the Federal Courts, hold that the right of removal resides in the party plaintiff or defendant and not in each of several plaintiffs and defendants."

See also the more recent case of *Diamond State Co.* v. *Blake,* 105 Md. 570.

It is true that in each of the two cases last cited its removal was resisted by one or more of the defendants, while in this case there was no resistance on the part of the defendant Kitchen, but whether any one or more of the parties plaintiff or defendant do or do not resist the removal of the case we think is immaterial, so far as the right of removal is concerned, if the suggestion and affidavit of removal is not made for or on behalf of all such parties plaintiff or defendant.

It was too late to exercise the right of removal after the jury was empanneled and sworn. *Price* v. *State,* 8 Gill, 295; *Cooke* v. *Cooke,* 41 Md. 368; *McMillan* v. *State,* 68 Md. 309.

As we find no error in the rulings of the Court the judgment will be affirmed.

*Judgment affirmed, with costs to the appellees.*