CORBIN C. COGSWELL, JR., ET AL. *v.* OTIS W. FRAZIER

[No. 30, October Term, 1944.]

*Decided November 16, 1944.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, CAPPER, and HENDERSON, JJ.

*Robert E. Coughlan, Jr.,* for the appellants.

*Jack L. Medwedeff,* with whom was *Max L. Berman* on the brief, for the appellee.

MELVIN, J., delivered the opinion of the Court.

The appeal in this case is from a judgment for $3,500 recovered by the appellee against the appellants for personal injuries sustained in a collision between the former's motorcycle and the latters' automobile at a street intersection in Baltimore City.

During the course of the trial twenty-four exceptions were reserved—the first twenty relating to the injuries sustained by the appellee, the twenty-first exception being to the admission of the police officer's report, the twenty-second being waived, the twenty-third being to that portion of the trial judge's charge to the jury which related to the question of permanency of the appellee's injuries, and the last exception being to the Court's refusal to grant appellants' prayers to withdraw the case from the jury. There were two of such prayers—the ordinary demurrer prayer and the other one to in-

struct the jury that the plaintiff was guilty of contributory negligence as a matter of law. These exceptions will be considered in inverse order, as the first inquiry is whether or not the case is one which should have been withdrawn from the jury.

The record shows two conflicting versions of the facts. According to the plaintiff's (appellee's) version, on the afternoon of March 23, 1943, he was operating his motorcycle in the south-bound lane of Broadway, a dual lane thoroughfare in Baltimore City, and as he approached the intersection with Orleans Street he saw, when about half a block away, that the traffic light was red. He slowed down and was practically stopped when the light changed to green, he being then about twelve or fifteen feet from the intersection. He, thereupon, after looking to his left and to his right, and seeing no other car close enough to be of any danger to him, started ahead. When he reached about the middle of the street he got a glimpse of the car operated by the appellant, Corbin C. Cogswell, Jr., which came upon him from his left and collided with the left side of his motorcycle, causing it to get out of control and inflicting upon him severe and painful injuries.

As a part of plaintiff's case there was read into the record a stipulation and agreement as to the cycle of lights at the intersection of Broadway and Orleans Street. This shows that when the light changes to red for east and west traffic on Orleans Street, it is then green for north and south-bound traffic on Broadway. Applied to the facts of this case, when appellee had the green light facing him in his south-bound lane on Broadway, the appellant had the same color of light facing him in his north-bound lane. At the same time, the lights were correspondingly just the opposite for the traffic on Orleans Street, so that when appellee got the green light to proceed on Broadway the appellant, turning from the north-bound lane on Broadway into Orleans Street, was subject to the red light at the latter point. If, on the other hand, the light on Broadway was red when ap-

pellee started to cross the intersection just before the collision occurred, appellant would have had the green light in his favor at that intersection, as claimed by him, instead of the red light against him, as claimed by the appellee.

The appellant's (Cogswell's) version of the facts of this case, in so far as the decisive point of the traffic lights is concerned, is thus directly opposite to that of the appellee's. According to the appellant, he was proceeding north on Broadway and as he approached the intersection with Orleans Street the light there turned green for north-bound traffic on Broadway. He made a left-hand turn into Orleans Street, proceeding west, and finding that the traffic light at the south-bound intersection of Orleans Street and Broadway was red, stopped his car. The light then changed from red to green. He started to cross the intersection and had travelled in low gear a distance of about five feet when he saw what "looked like a streak I didn't see that it was a motorcycle until it was right on my right fender. I threw on the brakes and the car stopped dead. It was just a click. * * * I had the green light going north on Broadway. There was a car that was in front of me, that was stopped at Orleans Street as I was approaching the intersection and that light changed to green and I had proceeded at the time I arrived at the corner so that I would not have to break my speed a great deal to make my turn into Orleans Street. I came to a stop about three feet behind the south-bound curb and waited there. When I arrived at the south-bound lane the traffic light was red for Orleans Street traffic. * * * I saw the traffic light change from red to green, and there is no question in my mind about it."

The appellant's version of the happening of the accident was substantiated by several other witnesses produced on his behalf. He also offered the testimony of the police officer who "covered" this accident. According to this particular testimony, the appellant did not tell the officer at the interview immediately after the

accident, that he had come to a stop anywhere. "He was going right on across," according to the officer's testimony. "He said that he had the green light and that he did not come to any stop. He said that this man, Frazier, came down Broadway going south, and that is how he happened to strike the motorcycle, and the machine went out of control and went on over on the sidewalk." This witness further testified that appellant claimed that the other man (Frazier) "ran through the light just before the accident" and that he, appellant, "had the green light."

The aforegoing is the state of the record on the point of the favoring traffic light at the street intrsction when, at the close of the case, the defendants offered their prayers to withdraw the case from the jury. That the trial court was correct in rejecting these prayers is too clear for extended comment.

There is no principle of law more thoroughly established, or more repeatedly emphasized, by this Court, than that a prayer seeking to take a case from the jury for the want of legally sufficient evidence, will not be granted if there is any evidence, however, slight, legally sufficient as tending to prove negligence, but the weight and value of such evidence will be left to the jury. *Yellow Cab Co. v. Henderson,* 183 Md. 546, 38 A. 2d 546; *State v. Carroll-Howard Supply Co.,* 183 Md. 293, 37 A. 2d 330, 331; *Taxicab Co. v. Hamburger,* 146 Md. 122, 125 A. 914; *Taxicab Co. v. Emanuel,* 125 Md. 246, 93 A. 807; *Mayor & City Council v. Bassett,* 132 Md. 427, 104 A. 39; *Moyer v. Justis,* 112 Md. 220, 76 A. 496; *Geiselman v. Schmidt,* 106 Md. 580, 585, 68 A. 202; *Mallette v. British-American Assur. Co.,* 91 Md. 471, 46 A. 1005; *Sun Cab Co. v. Reustle,* 172 Md. 494, 192 A. 292; *Jones v. Jones,* 45 Md. 144.

We concur in the conclusion of the trial court, as expressed in his charge to the jury "that the basic issue of whether or not the defendant was negligent is dependent upon this question: Who had the green light?" On this issue there was direct conflict between the respective versions of the facts, as given by the plaintiff and by the

defendant, thus making out a typical case for submission to the jury, and necessarily calling for the rejection of defendants' A, or demurrer, prayer.

Defendants' B prayer asked the court to rule as a matter of law that the plaintiff was guilty of contributory negligence. The single act of negligence cited to support this prayer is, as asserted in appellant's brief, "that the appellee did not look at the traffic light and that he did not look for automobiles but that he went blindly and heedlessly south on Broadway, across Orleans Street," regardless of the alleged fact that appellant's automobile could, and should, have been easily seen in time to have avoided the accident. Based on this assertion it is argued that appellee's testimony "has absolutely no weight."

However, the record shows that according to appellee's testimony he did not disregard the traffic light, that he did look for automobiles and that he did not go blindly and heedlessly into the intersection. On the contrary, he testified, he saw that the traffic light was red as he approached the intersection, that he slowed down and was practically stopped when the light changed from red to green, that he looked "to my left first and then looked back again to my right, and there was no other car coming any way close enough to be of any danger to me that I could see." He then proceeded in low gear slowly into the intersection. Whether or not appellee's testimony was believable was purely a matter for the jury, and not the court, to determine.

The record discloses no such distinct, prominent and decisive act on the part of the appellee as would amount to contributory negligence, as repeatedly defined by this Court. The rule is thus summed up in *Taxicab Co. v. Emanuel*, 125 Md. 246, 259, 260, 93 A. 807, 813: "The act relied on to establish, as a matter of law, the existence of contributory negligence must be distinct, prominent, and decisive, and one about which ordinary minds would not differ in declaring it to be negligence. Where the nature and attributes of an act relied on to show

negligence contributing to an injury sustained can only be determined correctly by considering all the attending and surrounding circumstances of the transaction, it falls within the province of the jury to pass upon and characterize it, and it is not for the court to determine its quality as matter of law." See also *State v. Carroll-Howard Supply Co.*, supra; *Holler v. Lowery*, 175 Md. 149, 200 A. 353; *Sun Cab Co. v. Faulkner*, 163 Md. 477. 163 A. 194; *Jones v. Wayman*, 169 Md. 670, 182 A. 417.

The appellants rely on the interpretation of the doctrine as given in the case of *Sullivan v. Smith*, 123 Md. 546, at page 556, 91 A. 456, at page 459, where it is stated: "One (well-established rule) is that when a witness says he looked and did not see an object, which he must have seen, if he did look, 'such testimony is unworthy of consideration,' to use the language of the opinion of Helms case [84 Md. 515, 36 A. 119], which has been followed and applied a number of times."

However, in the case at bar it was not only a question of whether the appellee failed to see appellants' automobile, but whether this failure alone, even if proved, was such contributory negligence as created liability, as a matter of law, regardless of whether or not it was the proximate cause of the accident. The point is settled that negligence alone does not answer the question of liability but that the negligence must have been the cause of the collision. *Sun Cab Co. v. Faulkner*, 163 Md. 477, 479, 163 A. 194; *Taxicab Co. v. Hamburger*, 146 Md. 122, 125 A. 914; *Slaysman v. Gerst*, 159 Md. 292, 150 A. 728.

In the instant case if the appellee had the green light in his favor as he entered the street intersection, he was entitled to assume that no one would unexpectedly drive across that intersection in violation of the right of way, in which event the jury could readily have determined, as the verdict here indicated, that this violation, and not appellee's failure to see the other car was the direct and proximate cause of the collision. We think that this issue was properly left to the jury, so that the court's ruling on this "B" prayer, likewise, was correct.

The appellants also excepted to the admitting of the police officer's report, on the ground that it violated the rule against hearsay evidence. There is no point to this exception, however, in view of the fact that the oral testimony of the witness, which, significantly, was offered on behalf of the defense, simply confirmed the statements in his written report. There was, admittedly, no variance in any essential particular between this written and oral testimony, so that his oath became, in effect, the primary substantive evidence relied upon. The witness' adoption of his written report made it his present assertion. *Blashfield Cyclopedia of Automobile Law & Practice,* Vol. 9, Part 2, Sec. 6201, page 649. The ruling on this exception was, therefore, neither erroneous nor prejudicial. *Koch v. Pearson,* 219 Ill. App. 468.

The remaining exceptions all relate to the question of the appellee's injuries and will be considered together. The first group, numbered one to twenty, inclusive, are to portions of the medical testimony, and the remaining exception is to the one point in the trial judge's charge to the jury which referred to permanency of the injuries. Besides the appellee himself, there was only one witness who testified about his injuries, and that was Dr. Edward E. Bauman, who was Assistant Resident of Orthopedic Surgery at Johns Hopkins Hospital at the time the appellee was a patient there. He had charge of appellee's case from the beginning (March 23, 1943) and continued to give treatments and make examinations as required, not only until the patient left the hospital, on crutches and with his leg in a cast, but until the day before the trial (January 14, 1944).

Of the appellee's injuries, the principal one, as revealed by X-ray examinations and as expertly described by Dr. Bauman, was a "comminuted fracture of the left tibia and fibula. Those are the two bones of the lower leg going down to the foot. Both bones were fractured. A comminuted fracture is a fracture which has taken place at several places, more than two. A compound comminuted fracture means that the bone has been ex-

posed to the air by laceration or tear of the skin or muscular tissue ordinarily surrounding the bone."

Owing to the serious nature of this injury special and prolonged treatment of it was required and this was given under Dr. Bauman's care and direction. During the two hours the patient was on the operating table, on the day of his arrival at the hospital, the exposed bones were put into position or "approximation" and the fragments were put in place and secured with screws. The wound was closed and a plaster cast was put over the entire leg. Examinations on March 25th, April 12th, May 2nd, June 9th and July 28th showed no healing or union of the bones, the doctor explaining in his testimony that the healing in this kind of a fracture is variable and that whatever union took place would be anywhere within six to eleven months. Additional examinations in September and November, 1943, and in January, 1944, showed that there was still no union.

Having thus reviewed the history of the case and detailed the treatments already given the appellee, Dr. Bauman stated that his prognosis was that with further treatment union is possible, but that if it did not occur within one or two months, accounting from the date of the trial, it would probably not take place at all. He further testified that: "Prognosis for the union is poor. Practically nil." He was then asked both by appellants' counsel and later by the Court what the effect would be on appellee's physical condition in either event —that is, if he ultimately got union or did not get it. He was also asked as to the permanency of appellee's injuries. His answer to the latter inquiry is enlightening and to the point, and as it applies, substantially, to all the exceptions to his testimony, is here quoted: "Since I have stated that the medical case is not finished, you understand, I say that this injury which he has sustained and the marks thereof will be permanent. The scar and the injury to the bone will always be able to be seen. I can't state whether he will go on and heal his bones and be able to walk without his brace at this time. I simply

say that his injury is permanent but that the final effects at this time, are not possible to be stated."

In view of the full testimony which the doctor had previously given as to the nature of this particular injury, the questions asked him as to the extent and probable effects of it were natural and logical ones to follow, and were relevant and admissible under the accepted rules of evidence. The opinions sought of him, and given, were entirely within the professional knowledge which he acquired as the attending physician and as medical expert, and he was a thoroughly competent witness in that connection. *United Rys. & Electric Co. v. Dean,* 117 Md. 686, 84 A. 75; *Benesch & Sons v. Ferkler,* 153 Md. 680, 682, 684, 139 A. 557; *Howard County Com'rs v. Pindell,* 119 Md. 69, 79, 85 A. 1041; *Gordon v. Opalecky,* 152 Md. 536, 550, 137 A. 299.

Moreover, his answers to these questions were as clear and as definite as could reasonably have been expected of any witness, and the jury were entitled to have the benefit of them—especially as this was the only witness called upon to furnish the medical testimony which was an integral part of the case.

We find no error in any of the rulings on these exceptions and are of the opinion that the case was fairly and correctly presented to the jury on all issues. The judgment, accordingly, will be affirmed.

*Judgment affirmed, with costs.*