## HENRY A. BREHM *vs.* THE PHILADELPHIA, BALTIMORE AND WASHINGTON RAILROAD COMPANY.

*Appeal—Inconsistent Contentions—Accident at Railway Crossing—Negligence of Driver—Duty to Look and Listen Continues Until Reaching Track.*

In an action to recover damages for the killing of the plaintiff's horses while being driven over a railway crossing, the declaration stated that the driver was the servant of the plaintiff and was using ordinary care at the time of the accident, and at the trial, the plaintiff asked that the question of the driver's contributory negligence should be submitted to the jury. *Held,* that, on appeal, the plaintiff will not be heard to say that the driver was not his servant, and the horses were not being used in his business at the time of the injury, and that therefore he was not responsible for the negligence of the driver.

The rule that when the view of the tracks at a railway crossing is obstructed, it is the duty of a person about to go upon them to stop, look and listen for approaching trains, is not complied with by doing so at a point where obstructions prevent him from seeing, and when, if he had stopped nearer the track in a place of safety, he could have seen and heard the train. It is, in such case, the duty of the driver to continue to look until he reaches the track.

The driver of a wagonette drawn by two horses and containing seven persons approached a railway crossing in the country. Both the road on which he was driving and the railway tracks were in cuts near the crossing. The driver knew that trains were frequently running there at high speed and was well acquainted with the dangerous character of the crossing. When the horses reached the track they were struck by a fast train and killed, but the persons in the wagon were not

seriously injured. In an action to recover damages, the plaintiff's evidence was that no whistle or bell was sounded for the train; that the driver stopped thirty feet from the crossing and looked and listened, without hearing a train, and that then he drove rapidly on the crossing. The evidence in the case established that from the point where the driver testified that he stopped, in the cut, neither he nor his passengers could see a train coming from the north except for a short distance, but that, beginning at a point twenty feet from the nearest track, there was a clear view up the track for over a mile. *Held*, that the driver was guilty of gross negligence in driving rapidly over the crossing after he had only stopped and looked for a train at a point whence it could not be seen, and when it could have been seen and heard from a safe place nearer the track if he had then looked and listened.

*Decided January 10th, 1911.*

Appeal from the Court of Common Pleas (HEUISLER, J.).

The cause was argued before BOYD, C. J., BRISCOE. PEARCE, SCHMUCKER, BURKE and PATTISON, JJ.

*S. S. Field* (with whom was *Samuel Regester* on the brief), for the appellant.

*Shirley Carter*, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellant sued the Pennsylvania Railroad Company and the appellee for killing two of his horses, while being driven at a point on the railroad used by the defendants, where a public highway is alleged to cross the tracks. During the trial the plaintiff dismissed the case against the Pennsylvania Railroad Company and it was afterwards with-

drawn from the jury on a prayer offered by the appellee, on the ground of contributory negligence of the driver.

The first two bills of exception embrace rulings on the admissibility of evidence and the third presents the action of the Court on the prayers. As that is the most important question, we will first consider the prayer of the defendant above referred to.

The accident happened about 6.35 o'clock on the evening of July 4th, 1908. Albert Jacobs, who then lived on the Wilton Stock Farm, which belonged to the plaintiff, and of which Dr. Tubbs, the stepfather of Jacobs, was manager, was driving two horses of the plaintiff which were hitched to a wagonette. There were seven persons in the wagonette, including the driver and a little girl. Although the appellee does not concede that the road over which the team was being driven was a public highway, there was undoubtedly evidence tending to show that it was, and it will be so treated in the consideration of the case. The railroad at the point where the accident happened runs north and south and the highway runs east and west—at least they are sufficiently near those directions for the purposes of our discussion, and we will so speak of them.

There are two tracks at this crossing, which is known as Dinsmore's Crossing—the one on which the trains run from Philadelphia to Baltimore being spoken of in the evidence as the south track, and the other the north track. The nearest station north of the crossing is Swan Creek Station, and the nearest south (towards Baltimore) is Aberdeen Station. Oakington Signal Tower is 6,800 feet, Swan Creek Station 2,700 feet, a bridge over Swan Creek about 1,400 feet, and there is a whistling post 1081 feet north of the crossing. There are about two miles of straight track from Oakington past Dinsmore's Crossing to Aberdeen. There is a down grade from a point about a thousand feet south of Oakington to a point near the Swan Creek bridge, where an upgrade begins and continues to Aberdeen, about a mile and a half—

there being this upgrade on the southbound track at Dinsmore's Crossing. A little north of Swan Creek Station there is an overhead bridge which carries a highway over the railroad tracks, known as the Robin Hood Road.

The appellant argued that the driver was not the plaintiff's servant and the team was not being used on his business, and hence he was not responsible for the contributory negligence of the driver, even if that be held to exist. But the declaration expressly alleges in the first count that the team was being driven "by the servant of the plaintiff, using due care," and in the second count it is alleged that the carriage and horses were being driven "by the servant of the plaintiff," that "the driver of said horses used ordinary and reasonable care in approaching and going upon said crossing," and "without any negligence on the part of the plaintiff or his servant the said horses were killed," etc. Moreover, the plaintiff upon the stand did not make such claim as was made at the argument, and by a prayer he offered he sought to submit the question of the contributory negligence of the driver to the jury. Under such circumstances we are not called upon to enter upon a discussion of the effect of the alleged contributory negligence of the driver upon the right of the plaintiff to recover, as the plaintiff cannot bring the defendants into Court to answer the charges thus deliberately made by him, take such position as he did during the trial, and then ask us on appeal to adopt a view wholly contrary to the one thus taken by him, which was not even raised in the lower Court so far as disclosed by the record.

There is a conflict between the witnessess for the plaintiff and those for the defendant as to whether any signals were given of the approach of the train, but as the case is presented we must assume the testimony of the witnesses for the plaintiff to be correct, as far as it goes. Having disposed of those questions we will now refer to such of the testimony reflecting upon the contributory negligence of the

driver as we deem proper, to show why we reach the conclusion to be announced.

About the place where the accident occurred the railroad runs through a cut and the highway is also in a cut to a point near the railroad tracks. The driver and other witnesses who were in the wagonette testified that they stopped in the cut, as they approached the crossing, about thirty feet from it and listened for trains; that from that point they could not see any distance up the track; that they knew the crossing was a dangerous one, and that one of them (Mrs. Still) pointed to the sign board which was at the crossing and said: "Now, stop, look and listen." After stopping and listening, not hearing any train, the driver started the horses and just as they got upon the southbound track they were struck by the train known as the "Congressional Limited," which was running very fast—the engineer said he thought about 50 miles an hour at that point, although sometimes it reached a speed of 65 or 75 miles an hour between Wilmington and Baltimore. The horses were killed and the wagonette and harness were injured but fortunately none of the persons riding in the wagonette were seriously hurt, and it was not even upset.

It had a cross seat in front on which sat the driver (Jacobs) and his grandmother (Mrs. Still), and there were two seats running lengthwise of the wagonette, one on each side, and those sitting on them entered from the rear. Mr. Watson was seated on the left-hand side, directly back of Mrs. Still, Mrs. Tubbs, the mother of Albert Jacobs, was sitting in the rear on the south side. Mrs. Jay was somewhere on that side and the others were not located in the testimony.

It is clear that from where they said the wagonette was stopped neither the driver nor anyone in it had an opportunity to see a train approaching from the north—nor had they the same opportunity to hear that they would have had, if they had not been in the cut. The Baltimore and Ohio

railroad also runs near the appellee's road and one of the witnesses said they could not hear any trains on either road. The engineer, fireman, conductor and baggage master, who were on the train, and a track walker who was approaching the crossing swore that the signal was given for the crossing, but the occupants of the wagonette swore they did not hear any signal, and one or two of them said that none was given and, in considering this prayer we must assume the testimony of the latter to be correct. If the train was running fifty miles an hour it only took sixteen seconds to go from the whistling post to the crossing, and if sixty miles only twelve and a fraction seconds. Or to state it another way, the train in the one case would move about sixty-seven feet and in the other about eighty-eight feet in a second, while if the vehicle was going at the rate of six miles an hour that would be nearly nine feet a second or at four miles an hour about six feet a second.

But, although the witnesses for the plaintiff testified that they stopped about thirty feet from the crossing, it is very evident that they had no definite knowledge of the distance, and none of them explained whether they meant that the horses' heads were that distance, or whether they referred to the wagonette, and if so, what part of it. As Dr. Tubbs testified that the distance from the horses' heads to the eyes of the driver was seventeen feet and to the rear end of the wagonette about twenty-six feet, it will be seen that it was a very indefinite statement to say they stopped thirty feet from the crossing. Jacobs said: "I stopped, I guess, about thirty feet back." Mrs. Tubbs said she would not like to say how many feet, or how close they were, but she thought that the horses' heads would have been on the track before they could have seen far enough down the track to be safe. Mrs. Jay said, "we stopped, I suppose, about thirty feet back." She also said the cut was higher than the wagonette. Mr. Watson, whose testimony was ruled out, said, "when we got with-

in about thirty feet of the track the driver stopped the team."

On the other hand, Mr. Stone, a civil engineer and Assistant Supervisor of the Maryland division of the railroad company, said he measured from the west rail of the southbound track, in the middle of the road, four distances, 12, 20, 25 and 30 feet; that standing 12 feet from the track on the road he could see north, up the railroad track, to Oakington signal tower (6,800 feet), could see from that point the railroad track and a train on it anywhere between the signal tower and the crossing; from a point 20 feet from the west rail there is the same view as at the point 12 feet; that at 25 feet from the track there is a clear view of the railroad track for 3,000 feet, or to a point beyond Swan Creek Station, could have seen a train anywhere in that distance on the southbound track, and that at a point 30 feet from the west rail he could see 235 feet up the track. On cross-examination he said the right of way of the railroad is seventy feet wide, that the center of the right of way is midway between the two tracks, and from that center line to the west rail is a little less than eight and a half feet. It was therefore twenty-six and a half feet from the west rail of the southbound track to the west side of the right of way. He also said that "after you pass 30 feet from the west rail the view of the track to any considerable distance was cut off by the bank." Six or seven witnesses who were present when the measurements were made and the observations taken corroborated Mr. Stone. One of them was a trackwalker on that section of the railroad and was near the crossing when the accident happened. He said that the grass had been mowed on the west side of the track, north of the crossing, all the way up to the top of the bank, and about three or four feet over the top just before the day of the accident, and he and others swore that there had been no changes in or about the crossing from the time of the accident to the time of the observations.

Although the observations were made in the winter time—just before the trial of the case—and the accident was on July 4th, it is perfectly apparent that the witnesses for the plaintiff did not accurately know the distance from the track at which they stopped. It is not shown what part of the wagonette Mrs. Jay was in, but she said, "The cut is higher than the wagon," and it is evident that she was at least far enough back to be in the cut. She admitted on cross-examination that she did not know "whether it was thirty or forty feet, because I cannot judge." Jacobs' testimony on this point was: "Q. What prevented you from seeing north? A. The bank. Q. Anything else there to obstruct the view? A. No, sir; nothing but a bank and a little clump of wood, but that is farther up and the bank was the only thing." It must be true that if there is in the winter time such views as were testified by the seven or eight witnesses from the points indicated, *the bank* could not have obstructed their view while the parties in the wagonette were at any of those points. It would further seem to be perfectly apparent that if their view was obstructed at any of those points, it was only by grass or little bushes which is all they testified to as being there in July, and it is difficult to understand why they could not have at least heard the rumbling of a train going fifty or more miles an hour, if there was no other obstruction and they were not behind the bank. The bank might possibly account for their not hearing, but it cannot be said that if a train is going upgrade at such a speed, or even if there was no grade, that persons listening for it could not hear its rumbling, if there was no other obstruction than grass and some small bushes. It is true that Mr. Watson said that there was a downgrade from Swan Creek Station to the place of accident, but the assistant supervisor of the road and the engineman certainly knew more about the grade than he did, even if his testimony is treated as before us.

The testimony therefore clearly shows that Jacobs must have stopped the horses when he was so far back that he was

behind the bank, where they could not hear. the noise the train must necessarily have made, and then did not stop again. If he could not hear or see where he stopped, then clearly he should either have stopped again, or have gone so carefully and slowly toward the track that he could at least have the horses under control. If Dr. Tubbs is correct in saying that it was seventeen feet from the horses' noses to the eyes of the driver, and that all view was cut off from that point, and they could not hear a train running fifty miles an hour, a prudent driver might well have suggested that Mr. Watson or someone get out and look up and down the tracks. Mrs. Jay said the trains did not always whistle at the post, all of them knew the crossing was a dangerous one and the tracks could have been seen for two miles, up and down, from this crossing. But without deciding that it was contributory negligence for the driver not to adopt that course, there is abundant evidence to show that the accident was caused by his recklessness in rapidly driving towards the crossing. If he could not see or hear the train from the point he stopped until the horses were on the track then it was gross negligence to approach the track at such a speed, and if he could have seen or heard it *within* thirty feet of the crossing, as the testimony of the defendant's witnesses tends to show, then it was only by reason of his negligence that he did not see or hear it.

The wagonette was large enough to carry ten passengers, and on this occasion there were seven, including the child and driver. Jacobs said: "I stopped, I guess, about thirty feet back, and did what the law requires, stop, look and listen. You cannot see anything, cannot see any distance up the track, and I started off and started my team quickly to get on the track and get over it if I could. If there was anything coming, I couldn't see anything, and when I got over and looked south Mr. Watson made some exclamation—I don't know just what it was—but I looked that way (indi-

cating) and I immediately took hold of my team and tried to pull them up but the momentum was so great I could not stop them." Mrs. Tubbs said: "We started up and if I remember correctly, I asked Albert to hurry across, because that was the way I always did it myself, and I would listen and then hurry across for fear another train would catch me in the meantime." Again she testified on cross-examination: "Q. And then you say you told him to go ahead quick when he started up? A. Yes, sir; that is always my instructions. Q. And he did start up quick? A. Yes, sir." Mrs. Still testified, "My daughter said we will hurry across anyhow and my grandson was sitting on my right, and he straightened out. The horses turned and he started as fast as he could." She also said "we heard nothing at all but there are so many trains on that road and we are always fearful in crossing."

Jacobs was looking south, and the only one who was supposed to look north sat in the wagonette facing the south, and had to turn around to look north. The driver undertook to explain his inability to stop the team by saying that owing to a downgrade on the highway the momentum was so great that he could not stop them. While some of the witnesses so speak of the grade, all of them admit it was a very slight one. The track walker said, "the road is a slight down grade to the railroad crossing; a grade of about three inches on either side, I don't think over that." He did not explain whether he meant it was three inches to the hundred feet or what, but it was evidently a slight grade. But if there was a grade which interfered with Jacobs stopping the horses, as soon as he could otherwise have done, it made his negligence all the greater. He and the others in the wagonette were familiar with the road, and to start rapidly down grade with a heavy wagonette, capable of carrying ten passengers and actually having seven in it, toward railroad tracks, with no opportunity to see or hear the approach of trains, as the appellant claims, until they were almost on the crossing, was evidence

of greater recklessness than can often be found referred to in the reported cases. The horses were perfectly gentle—Mrs. Tubbs said they were "not in the least" afraid of trains, and Dr. Tubbs said, "they were perfectly safe for everybody, and that is evidenced by their sacrificing their own lives that day by obeying orders." As the driver and others with him knew the dangerous character of the crossing, that trains were frequently passing and must have known the great speed at which they did pass, as the most of them lived in the neighborhood, if they could neither see nor hear the approach of trains, until they were nearly on the tracks, surely the most ordinary care demanded of him that he should stop his horses before crossing the tracks, and not start rapidly at a point thirty feet off and hurry through this peculiar space (where trains could neither be seen nor heard, although within a few feet of the tracks which were straight for two miles), until they finally reached the danger point, when it was impossible to check the horses by reason of the momentum which was largely caused by the speed at which he was going. If a driver is caught when attempting to cross over in front of a train which he sees, he is generally held to be guilty of contributory negligence, and it is not easy to understand why he is not equally so when he is caught by one which he can neither see nor hear, but has reason to fear that it may be approaching, and yet does not adopt the precautions which every person of ordinary intelligence ought to know should be adopted.

Jacobs' statement, that "I started off and started my team quickly to get on the track and *get over it if I could*," is of itself sufficient to convict him of gross negligence. It is true he and the others in the wagonette said they stopped, looked and listened at the point about thirty feet away and that they neither heard nor saw any trains, but that was, according to their testimony, because they could not see or hear anywhere they were. The fact is, as shown by the results, that this

train was on the southbound track, and if the plaintiff's testimony is correct that those in the wagon did listen but they did not hear it, it must have been because they could not have heard it where they stopped, but even if no whistle was blown they certainly could have heard the rumbling of the train if they had stopped nearer the track, and we think the testimony conclusively shows that they could have seen it in time to avoid the accident, if they had looked from a point nearer the crossing.

It is now thoroughly established in this State that if the view be obstructed it is the duty of a traveler to stop, look and listen before attempting to cross a railroad. That rule is not complied with by merely stopping, looking and listening once, if the object in doing so cannot there be accomplished, but can be closer to the tracks. A traveler might as well stop, look and listen a quarter of a mile from the railroad as thirty or forty feet away, if he can neither see nor hear at the latter point, although he can before he attempts to cross the track. Of course, Courts cannot fix any definite distance from the tracks at which travelers must stop, but that requirement varies according to circumstances. It may be that the traveler can better determine whether it is safe to cross by stopping at a point fifty or a hundred feet from the crossing than he could by stopping closer, as sometimes the view up and down the track is more extensive at a remote than at a closer point, owing to the conditions, but it would be useless to adopt the rule which requires a traveler on a highway to use care, before attempting to cross railroad tracks, if such care is to be exercised away from the track, and then utterly neglected as he approaches near to it. That rule is for the protection of travelers on a highway as well as of the passengers and employes on the trains. It is not by any means an unheard of thing for an engineman or fireman to lose his life or limb, or at least be seriously injured, by reason of his engine being thrown off the track by the

careless act of some traveler on a highway. The traveling public of the present day demands speed, and distance is overcome by it. It is to be hoped that the day is not far distant when grade crossings will be unknown—at least such as are frequently used by the public—but until that time arrives the law at least must protect passengers and trainmen to the extent of discouraging recklessness on the part of those crossing the tracks.

Without deeming it necessary to review the authorities at length, there are some in this State which we think are conclusive against the right of the plaintiff to recover. The cases of *Phil. & Balto. R. R. Co.* v. *Holden,* 93 Md. 417, and *A. W. & B. R. R. Co.* v. *State, use of Hickox,* 104 Md. 659, are perhaps more applicable to this than any of the others. It is true that in both of them the accidents were at private crossings, but in the former, where the negligence of the defendant relied on was the failure to give a signal at an accustomed place, the Court, after saying that the railroad company was not required to give a signal at private crossings, said: "But, if we assume that the plaintiff had been injured at a public crossing, there can be no doubt that the failure to give the signal would not have been admissible to excuse him, that is, to show he was not guilty of contributory negligence." In the *Hickox case* we referred to a number of others, including that of *Hatcher* v. *McDermot,* 103 Md. 78, where we held that "the plaintiff was guilty of contributory negligence for crossing an electric railway on a public crossing without having again stopped, looked and listened for a car, after he left a point about one hundred and thirty feet distant from the crossing, where he did stop, look and listen, but where his view was obstructed to some extent." We also referred to *Meidling* v. *United Ry. Co.,* 97 Md. 76, in which we quoted with approval from *Keenan's case,* 202 Pa. 107, where it was held to be the duty of the plaintiff "to continue to look until the track is reached." In that case the

plaintiff could have seen the approach of a car from a point where he did look until he reached the crossing, as there was no obstruction excepting the curtains on his wagon, while in this case the driver could not see a train, and did not hear one from the point where he stopped, and he then ceased his vigilance.  As said in *Keenan's case*: "But his misfortune is that he was careful but for an instant, when he should have continued to be watchful until the track—the real point of danger—was reached."  In *Hickox case* we said: "It is no excuse for one not to stop, look and listen when he is near the track because he did so further away at a point where he could not see, if he looked, and according to the plaintiff's contention, could not hear if he listened.  If his view was obstructed, and the sound interfered with, it made it all the more important for him to stop again."  Again, in speaking of the cross-ties, which were the obstruction in that case, we said: "Even if they were only ten or twelve feet away, if up to that point they obstructed the view from the private road, it was the duty of the deceased to again stop, look and listen for the train, which he had reason to expect."  The learned attorney for the appellant undertook to make some distinction between that case and this on account of that expression, "which he had reason to expect."  But in this case the train which struck the horses was running on schedule time, and Mrs. Jay said: "The train was the Congressional Limited, going very fast, it always goes fast."  Mrs. Still, who was sitting by her grandson, the driver, said, "there are so many trains on that road, and we are always fearful in crossing."  All of them showed great familiarity with the railroad at this crossing, and they knew perfectly well that a train might be coming at that very time.  Even if there was not one due, as there was, they knew, as their conduct as testified to by them shows, that a train might pass there at any time.  So without citing other cases, those and others referred to in them sufficiently show the rule in this

State to establish beyond controversy that the action of the driver on this occasion was not only contributory negligence, but was of a most reckless character, under the circumstances we have related at length.

Having reached that conclusion, it would be useless to refer to the other exceptions, as different rulings on them, or either of them, would not change the result.

> *Judgment affirmed, the appellant to pay the costs, above and below.*