# ALEXANDER SIEJAK

### vs.

# THE UNITED RAILWAYS AND ELECTRIC COMPANY.

*Contributory Negligence—Railroad Crossing—Duty to Stop—Automobile Truck.*

Contributory negligence is simply negligence, and is, like primary negligence, relative and not absolute, and being relative it is dependent on the peculiar circumstances of each particular case.        p. 373

In an action by one struck by a train at a crossing on defendant's electric railroad, it appearing that plaintiff was well acquainted with the crossing and its dangerous character, and that while he stopped the automobile truck which he was driving more than one hundred feet from the crossing, he failed to stop on nearing the track or to send one of his companions ahead to look for trains, although his view of the tracks in the direction whence the train came was obstructed until within four feet of the tracks, *held* that he was guilty of contributory negligence precluding recovery.        pp. 373, 378

One about to drive across a railroad track is not free from contributory negligence because he stops and looks, at the last place from which he can see an approaching train while in his vehicle, it being his duty to stop and *listen* immediately before driving on the track, even though he cannot then see, by reason of obstructions.        p. 374

One who, when about to drive his automobile across a railroad, receives warning of danger in time to stop on the nearer track, of which there is a clear view for a long distance in the direction whence trains run on that track, and fails to do so, is guilty of contributory negligence precluding recovery for injuries caused by a train running in the opposite direction on the farther track.        pp. 375, 376

*Decided December 10th, 1919.*

Appeal from the Court of Common Pleas of Baltimore City (AMBLER, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*William H. Lawrence*, for appellant, submitted the cause on brief.

*R. Lee Slingluff*, with whom were *J. Pembroke Thom* and *Walter V. Harrison* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

The accident in this case occurred at the intersection of the right of way of the appellee which runs north and south, and Fifth avenue, also known as the Shell Road, which crosses the right of way almost at right angles and runs nearly east and west. Trappe Road runs northwest and southeast, crossing the railroad tracks about 150 feet north of Fifth avenue and crossing Fifth avenue about 100 or 150 feet east of the railroad.

On the north side of Fifth avenue, adjoining the right of way on the east side, is a building known as Tolson's Store about 10 or 12 feet from the east or northbound tracks. Between this store and the track, near the north end of the store and about 50 feet from Fifth avenue, is a small waiting station. The east track is the northbound track on which trains run from Sparrows Point to Baltimore and the west track is the southbound track from Baltimore to Sparrows Point. The three-car train which struck and damaged appellant's truck was running on the west or southbound track and the accident occurred on June 5th, 1918, at about 4.30 P. M. or 5 P. M. The truck was heavily loaded with several tons of tin cans. It appears from blue prints, photographs and other evidence, that on approaching the Fifth avenue crossing from the east the view of the tracks north of Fifth avenue is entirely obstructed, from Trappe Road to within about ten or twelve feet of the northbound track, by Tolson's store, and for a further distance of eight feet partially obstructed by the waiting room which is ten or eleven feet high, so that after crossing the Trappe Road one would have to get

within from 4 feet to 18 inches of the northbound track before having a clear view of the track looking north, but at that distance there was an unobstructed view for the distance of two blocks up the track to a curve in the railroad. The train which struck the truck, according to appellant's witnesses, was running at a high rate of speed and gave no signal on approaching the crossing. Back of Tolson's store at or about the intersection of Trappe Road and Fifth avenue appellant stopped and looked up and down the track and listened for approaching trains, but neither saw nor heard any. He was coming from the Bethlehem Steel Company and had with him his employer, Mr. Wilson, and his (appellant's) son, seven years old. In answer to a question what he did before he came to the crossing, appellant testified: "Well, before I came to the crossing, because I seen before it is a killing place there, killed my friend. I used to haul wood for him with a horse, so I knew there was a bad crossing there. and I stopped about a minute or two; I believe about two minutes anyhow, because from McComas' saloon coming across from the Monumental Road I said to Mr. Wilson, this is a very bad crossing and I like to save you and myself because I know it is a dangerous place, those cars run wild here, some of them stop and some of them don't." He was going very slow down hill. "This (indicating) is Tolson's. Back of that store is Graceland 150 feet, and I tried to hear from the side that car whistle; they whistle like Pennsylvania cars; and I didn't hear no whistle. I can hear when a train whistles or them cars whistle, but I didn't hear no whistle or bell, and automobiles went by me, they went ahead of me, and I went, slowing down, drifting with the road, because I had thirty boxes of heavy tin, and I was coming right to the crossing. Some man came there and held his hand. I don't know what that meant; and something hit me."

"If I would stop on the crossing I would have been killed right there, me and my boy and Mr. Wilson. I couldn't stop

my truck because I put my brakes down and I was going slow in first gear."

"(The Court) : You stopped right where the Trappe road runs into the Shell road?" "Yes, I couldn't stop any other way, Mister."

In answer to a question why he stopped there he said: "Well, I stopped to see is them cars running so fast, I could see them. Then I drove down. The truck, the car was not running. I had the brakes on, the clutch you know and the brake, and I let the truck float with the weight, and as soon as I took my brake off and the clutch the truck started to run, and I put my first gear and I was running ever since in first gear."

"Q. Then, when you got down to Tolson's corner, the car track is right there, isn't it? A. Yes. There were two automobiles; one was loading, I believe gasoline; and the other one, I don't know what he was doing. Pleasure cars, waiting for people to come from the city."

He was following a car ahead of him which crossed over safely about five or six feet ahead of him. When he got down to Tolson's corner couldn't see the electric car coming. It was so crowded with people there on both sides; couldn't see any car; tried to look over them and couldn't see; he could see over the people. At another place witness says he could not see over the people on account of his seat being low in the car, about four feet from the ground. Car was running slowly, about five miles an hour; front wheels of car about three feet ahead of his seat; was sitting on left side; when he got to Tolson's corner looked but didn't see car, don't know why he couldn't see, can't understand that; couldn't see because of a lot of big trees growing on both sides; (photographs don't disclose any trees likely to interfere with vision). Asked if anything else interfered with him, witness replied, "No, nothing was interfering with me." Here witness' counsel asked if waiting box had anything to do with his looking up in the direction of the city for the approach of a car. His answer was: "That time when I

came down to the crossing the people, the men ran out in the path, I don't know what happened, and I had a load of tin on the truck and I was going very slow and I didn't see no car coming, and the track on the right side, crossing from Sparrows Point, I didn't see no car coming, and from that side I didn't see no car." When he got up by Tolson's two automobiles were there, one along side Tolson's, one was a little bit further, towards the track more, witness was between them; he was on the cement, they were on the dirt, the car he was following "was in front of me, he go by"; when he got there (that space between the track and Tolson's) he couldn't see; "Couldn't see because there were men there, a whole lot of men there, waiting for a car, both sides." "I didn't see no car coming that minute; nothing to keep him from looking down towards Sparrows Point. Asked again whether the watch box or reception box had any effect upon his seeing, his reply was: "Oh, yes; because that roof is painted kind of red and I couldn't see it very good."

"But," asked the Court, "did the box stop you and the people stop you too from looking up the track?" Answer: "I guess it was the box stopped me from seeing the car."

On cross-examination the witness said he knew all that country down there *very well;* had been up and down the Shell road thousands of times; had been hauling tin up and down three times a day each way since April; knew the cars ran down there fast and that some of them didn't stop; knew it was a dangerous place; "Now I go with my horse I send a boy out a square away before I go there. I know one accident, I wouldn't get another accident at all"; would have sent the boy ahead if he had known the car was coming. The boy didn't go because he didn't tell him to get off; knew the warning sign, "Stop, look and listen" was there; saw northbound car from Sparrows Point go by when he was 100 feet away from the back of Tolson's store; when he got to Tolson's was on his slow gear; took it out of gear and stopped and looked. "Then I put him in low gear to start up again because my engine was stopped, and when I lifted the brakes

up and clutch up, then she started to run a little, and then I put it in gear and chug, chug, chug, she went and I went slowly in first gear, for my brakes wouldn't hold it. In first gear she couldn't go no faster."

Appellant further testified that the first time he saw the car that struck him was when "I was about three feet over the track back of my seat, then I saw the car."

Wilson, who was on the truck with appellant, testified that the truck was stopped at about the Trappe road intersection with the Shell road, and gear shifted into second or low and they looked out for the car; from that point they kept on going right along until they were struck; the first he saw of the car or train was when they got far enough beyond the corner of the store to look up the track; witness was sitting on the right side; the train was then about 100 yards up the track; saw people holding up their hands as a warning when the truck was about on a line with the front of Tolson's store, six or seven feet from the track, then just as soon as they held up their hands or they thought there was danger appellant applied his brakes immediately, "I don't know how fast, he shut it down just as fast as he could. There is a little incline there going down towards the track, and probably he couldn't shut it off as quick as he wanted to, but he applied his brake the moment somebody raised his hand up."

In answer to a question why appellant couldn't stop the truck, witness said: "Well, of course you can understand if the truck is loaded down with eight or ten thousand pounds of stuff the natural law of gravity will carry that truck along at such speed that it would be next to impossible to stop within three or four feet, and he didn't want to stop of course I presume on the northbound track, he didn't want to take a chance. Of course, I don't know what his feelings were; I knew what mine were; I just looked at that car and couldn't have seen anything else. Now he might have turned down the southbound (probably meant northbound) track if he had thought there wasn't a car coming there, but he didn't know that of course, and rather than take a chance stopping in the

track, he tried to get across that track, because he was so close to it that, to all intents and purposes, it seemed that car was just about to bear down on the front seat we were in, and I thought sure it would, and that's all I remember until I was picked up off the road." On cross-examination the witness said he didn't think they could have seen the car at the corner of Tolson's, but added "If you wish me to make a further statement we could see the car when we got closer to the southbound track, going towards the city." He must have meant the northbound track, as he later said, "we would have to pass that store," and besides he referred to the track going towards the city.

Several witnesses testified a train on the southbound track could not be seen without getting on the northbound track, and also testified that the approaching train was running very fast and gave no signal. One of these witnesses however said he was on the east side of the northbound track; could see up the track; saw the car coming—clear up to the curve. It is rather significant that of the crowd of witnesses of this accident only four besides the appellant and Mr. Wilson, who was with him on the truck, appear to have testified for appellant. The appellee offered no testimony, but at conclusion of appellant's testimony, at the request of appellee, the Court instructed the jury "that from the uncontradicted evidence in the case, the plaintiff was guilty of negligence directly contributory to the accident complained of" and therefore their verdict should be for the defendant.

Plaintiff excepted to this instruction, and this is the only exception upon which we are required to pass.

We have given a very full abstract of the testimony because, as said by JUDGE McSHERRY, speaking for this Court in *McNabb* v. *United Railways Co.*, 94 Md. 724, "Contributory negligence is simply negligence, and is, like primary negligence, relative and not absolute, and being relative it is dependent on the peculiar circumstances of each particular case. There are many acts which would not be negligent when done under some conditions, though the same acts if

done under different conditions might be highly negligent. And this is equally true of contributory negligence, so, ultimately, in every case of this character it becomes necessary to view the entire surroundings to determine whether either primary or contributory negligence has been established."

In the case at bar if it could have been properly held that the plaintiff was required only to stop and *look*, at the last place *before getting on the track* from which sitting in his truck he could see an approaching train, then it would have been error to hold that, as a matter of law, he was guilty of contributory negligence, because the jury might well have found from the plaintiff's evidence that by reason of the surrounding circumstances there was no place after reaching Tolson's store from which he, while sitting in the truck, could have seen the train that struck him until he drove on the northbound track. There was evidence that the store and the waiting station obstructed the view up to a point variously estimated from four feet to eighteen inches of the track and also there was an automobile on his right as he approached the track. But to *look* is only part of the requirement. It was just as much his duty to *listen*, and there is no evidence in the case that he could not have heard a train of three cars approaching at a speed of twenty-five or more miles an hour if he had driven up to the track and stopped there before attempting to go across. Here was a man who was thoroughly familiar with the crossing and recognized it as exceedingly dangerous, having had a friend killed there, and having driven over it himself "thousands of times." He knew that the travel was heavy on account of the large number of people employed at Camp Holabird and Sparrows Point; that it was necessary for the trains to run at great speed in order to accommodate the people, and that many trains passed that station without stopping. He had been engaged in hauling tin over that same route for two months before the accident, crossing the track at this point four times every day. He knew that the view of the tracks north of this crossing

was obstructed for a hundred feet or more in approaching from the east and that it was necessary, according to his testimony, either to drive upon the northbound track or to get off his truck or send someone ahead in order to see a train approaching on the southbound track; he also knew the grade of the road and the difficulty of stopping a heavily loaded truck within a few feet on a down grade, and he had with him two persons, one of whom was his son, whom he could easily have sent ahead to make sure that the crossing was safe, and yet he neglected every precaution which, according to his own testimony, could have availed him anything under the conditions at that time existing, after he had stopped at a point at least one hundred feet distant from the point of danger. The accident happened in broad daylight.

"It would be useless to adopt the rule which requires a traveler on the highway to use care, before attempting to cross the railroad tracks, if such care is to be exercised away from the track and then utterly neglected as he approaches near to it." *Glick* v. *Cumberland and Westernport Electric Ry.,* 124 Md. 308. See also *O'Meary* v. *B. & B. Ry. Co.,* 133 Md. 503; *Brehm* v. *P., B. & W. R. R. Co.,* 114 Md. 302; *Annapolis, etc., R. R. Co.* v. *Hickox,* 104 Md. 659; *Manfuso* v. *W. Md. R. R. Co.,* 102 Md. 257; and earlier Maryland cases.

Besides appellant was warned of the danger by some one waving to him when he was still six or seven feet from the track. There is some testimony that on receiving the warning he at once put on the brakes but could not stop the truck within three or four feet on account of the heavy load and the slightly down grade at that point, but it further appears that he could have stopped on the northbound track, where he could have halted for a few seconds without danger, as he had an unobstructed view of the track towards the south for a long distance and knew there was no train in sight coming from that direction. He not only did not stop, but apparently did not look after he got on this track, for according to

his testimony he did not see the train that struck him until he was "about three feet over the track back of my (his) seat."

In *McNab* v. *United Rys. Co.*, 94 Md. 719, this Court said that where a lady driving a horse had crossed one track and had reached the space between the tracks when she saw a train approaching on the other track at a distance of forty feet, it was her duty to wait where she was or pull her horse back on the track she had crossed, and that her attempt to cross the other track resulting in injury constituted contributory negligence.  See also *New York Central & H. R. R. R. Co.*, v. *Maidment*, 168 Fed. 21, 21 L. R. A. (N. S.) 794, in which Judge Buffington says: "From where he stopped it was impossible to see up the track, in the direction the westbound trains would come from, further than 180 feet. Trees and bushes on the property adjoining defendant's right of way cut off all sight of the track beyond that short distance.  He could see in the other direction a long way, and knew that no train was following the freight.  Moreover, by stopping the automobile on the track which the freight had just passed over, he could see the eastbound track for upwards of 700 feet. * * * It will thus be seen that, when the plaintiff made his only stop, he had no sufficient view of the track on which westbound trains came, and that he made no stop on the eastbound track from which he could have seen a train coming on the westbound one.  This was negligence, a lack of precaution and reasonable care which would have prevented the accident. * * * Indeed the whole proof shows the plaintiff took chances, instead of precautions.  We have seen he had no sufficient view when he first stopped.  His view became worse as he went down the steep declivity to the track. * * * But the plaintiff was not without means of crossing in safety.  A second man was in the automobile.  He could have gone ahead to the eastbound track or Maidment could have safely halted the machine there.  Instead of doing this, and without sight of the westbound track, save for the

very short distance a swift train would quickly cover, he took the chance of dashing across."

There has been no case in which it was more important to emphasize the necessity for strict adherence to the rules above referred to. If the train had struck the truck of appellant a second earlier there would doubtless have been serious, if not fatal, injuries to many passengers on the train. It is important to remember that the care required of travelers on a public highway on approaching and crossing a railroad track is for the protection of those traveling on railroad trains as well as for the safety of those using the highways, and it is not difficult to foresee the fatal consequences that would result if those driving automobiles and motor trucks were not held to a proper degree of care in this regard. The reason for requiring even greater care on the part of those using these machines are very clearly and forcefully stated in the *Maidment case, supra.*

"With the coming into use of the automobile, new questions as to reciprocal rights and duties of the public and those using that vehicle have and will continue to arise. At no place are those relations more important than at the grade crossings of railroads. The main consideration hitherto with reference to such crossings has been the danger to those crossing. A ponderous, swiftly moving locomotive followed by a heavy train is subjected to slight danger by a crossing foot passenger, or a span of horses and a vehicle; but, when the passing vehicle is a ponderous steel structure, it threatens, not only the safety of its own occupants, but also those on the colliding train. And when to the perfect control of such a machine is added the factor of high speed, the temptation to dash over a track at a terrific speed makes the automobile, unless carefully controlled, a new and grave element of crossing danger. On the other hand, when properly controlled, this powerful machine possesses capabilities contributing to safety. When a driver of horses attempts to make a crossing and is suddenly confronted by a train, difficulties face him

to which the automobile is not subject.  He cannot drive close to the track, or stop there, without risk of his horse frightening, shying, or overturning his vehicle.  He cannot well leave his horse standing, and, if he goes forward to the track to get an unobserved view and look for coming trains, he might have to lead his horse or team with him.  These precautions the automobile driver can take, carefully and deliberately, and without the nervousness communicated by a frightened horse.  It will thus be seen an automobile driver has the opportunity, if the situation is one of uncertainty, to settle that uncertainty on the side of safety, with less inconvenience, no danger, and more surely, than the driver of a horse.  Such being the case, the law, both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver to such reasonable care and precaution as go to his own safety and that of the traveling public. * * * The duty of an automobile driver approaching tracks where there is restricted vision to stop, look and listen, and to do so at a time and place where stopping and where looking and where listening will be effective, is a positive duty, and these safeguarding steps the plaintiff failed to take.  He stopped where stopping served no purpose, and failed to stop where stopping would have disclosed danger. He made chance, and not sight, the guaranty of his safety. We are clear he was guilty of contributory negligence."

In conclusion it may be well to refer to the clear distinction drawn by JUDGE BURKE in the case of *Heinz* v. *B. & O. R. R. Co.,* 113 Md. 583, relied on by appellant, between the facts of that case and those in the case of *Annapolis, W. & B. R. R. Co.* v. *Hickok,* 104 Md. 659, in which CHIEF JUDGE BOYD wrote the opinion of this Court, and in which the facts are in many respects similar to those in the case at bar.

*Judgment affirmed, with costs to appellee.*