BALTIMORE TRANSIT COMPANY *v.* GEORGE W. LEWIS

[No. 24, April Term, 1938.]

*Decided June 14th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Wallis Giffen,* with whom was *Philip S. Ball* on the brief, for the appellant.

*Daniel S. Sullivan,* with whom were *J. Howard Murray* and *Daniel S. Sullivan, Jr.,* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

On September 6th, 1936, the accident of which the appellee (plaintiff below) complains, occurred in Baltimore County, at a point where what is known as the Old Bay Road, a public highway, crosses a single track line of the Baltimore Transit Company, the appellant, which company operates an electric street car service extending into and servicing rural territory adjacent to the City of Baltimore.

At the trial below the appellee testified that on the day of the accident he was driving a Cadillac 1929 model sedan automobile from a resort known as Bay Shore toward a resort known as Bay Side, at which latter place he and the other occupants of his car were spending the week end; that the route between the two points was along the North Point or Fort Howard Road (hereinafter designated as North Point Road), until it was intersected by the Old Bay Road, and thence over the latter road across the railway track; that the general course of the former road is north and south, and that it parallels the railroad track a short distance to the east thereof; that the course of the Old Bay Road is east and west; that it comes to a stop at its intersection with the North Point Road, and at a distance of eighty feet east of the railway track, and crosses the track approximately at right angles; that the accident happened at 3:30 P. M. on a clear day; that beside him on the right front seat of the

sedan was his wife, and that the other occupants of the car were his daughter and Albert W. Bramble, who, respectively, occupied the left and right rear seats.

The witness further testified that as he approached the Old Bay Road, which was twenty feet in width, he slowed down to make the right hand turn; that he then proceeded toward the railway track at "about the speed of a walk" and stopped his automobile so as to place the bumper within two and a half or three feet of the east rail of the track; he was then on his right of the center of the road; that he then changed his gear to neutral, and from his position in the automobile, approximately twelve feet from the east rail of the track, he could see one hundred feet to his left or south; that near the east side of the right of way of the railroad and the south side of the Old Bay Road, there was a shed, and that further south, in line with the shed, there was another building; that between the line of these two buildings and the railroad right of way there were bushes six to nine feet high, standing seven feet from the railway track, which in connection with telephone poles and wires along the track limited his view of the track toward the south, to approximately one hundred feet; he estimated that he was seated four feet from the ground and that the level of his view was approximately six feet from the ground. At this point his testimony proceeded as follows:

"Q. All right, Mr. Lewis, you came to a stop and what did you do? A. I looked to the left and there was no car in sight, and no sound of a whistle—— Q. Any other sounds? A. Nothing. Q. You heard nothing? A. No, sir. Q. All right? A. I looked to the right and I could see four or five hundred feet down and nothing in sight and I proceeded slowly—— Q. Four to five hundred feet to the right, and what did you say to the left a while ago? A. About one hundred. Q. Is the track straight to the left? A. It was a generally straight track. Q. Was there any curve in it? A. No. Q. Then you started forward again and what next did you do? A. I threw

the car in low and started up very slowly, and my radio was approximately a few inches on the other side—— Q. You mean your radiator? A. Yes, sir; and I looked to my left and there was a street car within thirty feet of me. Q. The other side of what? A. Of the first track. Q. Of the first rail, you mean? A. Yes, sir. Q. Was the street car making a stop? A. The street car was running at a speed of thirty-five miles an hour. Q. Now, at any time before you saw that street car thirty feet away coming towards you—it was coming towards you? A. Yes, sir. Q. Coming from your left? A. Yes, sir. Q. Was any signal of any kind given by the motorman? A. No, sir. Q. Any whistle blown? A. No, sir. Q. Any bell rung? A. No, sir. Q. At the time it hit you—did it hit you? A. I guess it did, sir."

Further detailing the unfortunate accident, the appellee stated that when he saw the car thirty feet away, approaching at a speed of thirty-five miles an hour, he pushed on the accelerator and tried to cross; at that instant he estimated that his radiator had crossed beyond the east rail of the track three or four inches—the front wheels were not over the rail—but he did not attempt to go in reverse because he thought it would be safer to attempt to pass ahead of the car; and that the road at the point of the collision was level. It was also testified by this witness that a "stop, look and listen" warning sign was stationed a short distance east of the track and north of Old Bay Road; that he knew of the existence of the sign, and had passed it a short distance when he came to a stop; that the crossing was a public one over which he had traveled a number of times; that the electric poles were thirty feet high, and that he might have been able to see the trolley wires above the growth but paid no attention to them. After testifying that three or four seconds elapsed between the time he stopped and the time he started across the track, on cross-examination he stated:

"Q. If you stopped three or four seconds before going on the car track, how long was it from the time that you

got on it and saw the street car—— A. I could not tell you. Q. It was not more than that, was it? A. I do not know. Q. Now, Mr. Lewis, won't you admit that you only stopped momentarily and shoved your gears and started across? A. I will say yes. Q. Momentarily? A. Yes. Q. And in a moment or two afterwards, when the front of your automobile was well on the track, you then for the first time saw the street car only thirty feet away—is not that so? A. Yes, but how many seconds elapsed I would not want to say. Q. It was only a moment or two? A. That is your idea. Q. I am asking you? A. I told you I don't know. Q. Don't you know it was only a moment or two when you did not see the street car and started up and you got out on the car track and—— A. I can't answer that intelligently. Q. It all happened very suddenly? A. It was very sudden to me, yes, sir."

Mrs. Lewis was killed in the accident; and the other two occupants of the sedan, testifying on behalf of the appellee, substantially corroborated him as to the movements of the automobile from the time it turned into Old Bay Road down to the time of the impact. Both witnesses stated that the automobile was momentarily stopped; that the appellee looked in both directions, and then started to cross the track.

The witness Bramble stated that from his position in the car he could not see in a southerly direction down the track, because his vision was cut off by one of the buildings referred to in the appellee's testimony, and that he did not see the street car until about the time the automobile started across the track. He estimated that when he first saw the car it was fifty feet south of the automobile, and its speed as being forty miles per hour. He did not hear anything, and "there was no signal of any kind given." He was well acquainted with the crossing and the territory immediately adjacent thereto; and when asked if, from his point of view at the time the automobile was stopped, it was not possible for him to have seen the trolley wire on the track, above the obstructions which precluded his seeing the track south of the road,

he stated that he did not look, but would not say that it was impossible for him to have seen the top of the car and the trolley pole running along the trolley wire.

George Richard Labuda, seventeen years of age, was sitting on the porch of his father's store, located across from the railroad and south of Old Bay Road, at a point approximately one hundred and twenty feet distant from the point where the automobile is said to have been stopped. From his position he could see across and east of the street car track, and also a section of the track both north and south of Old Bay Road. He testified that he saw the automobile which the appellee was driving when it first made the turn in Old Bay Road, and that "it slowed down, and after it turned it came to a stop at the street car track, and when it came to a stop I saw the street car coming and I did not know what to do, and I started to holler and I could not holler, and just then it started to go across the track, and the street car hit it right in the center of the automobile." According to this witness, the automobile was stopped about four feet east of the track, when the street car was about the length of a street car away. He first estimated the length of a street car as being ninety feet, but when told that a street car measures forty-four feet, he still adhered to the estimate of the distance as being the "length of a street car". He stated that no whistle was blown until the instant of the impact, and that the automobile was pushed north of the highway to a point about one foot north of the north end of the landing place to the west of the railroad track, which distance is fixed by other testimony in the record as being approximately eighty-five feet. He fixed the speed of the car at between thirty and thirty-five miles an hour, and identified, as had the appellee, a photograph, designated as Plaintiff's Exhibit No. 1, which tended to show the general surroundings of the track at the time of the accident, as being a fair presentation of all growth or obstructions along the track south of the road.

Albert G. Hesse, a civil engineer in the employ of the

appellant, was called by the latter for the purpose of establishing distances from the scene of the accident to various points within the immediate vicinity, and also of identifying photographs of the scene, filed as defendant's exhibits, some of which were taken the day following the accident, and others taken on subsequent dates shortly thereafter; the photographer who took the pictures in the presence of the witness having died before the trial. This witness also identified a survey and plat which he personally made, and which was filed in the case. This plat, as verified by his testimony, tends to show that there is an upgrade of two per cent on Old Bay Road from its intersection with North Point Road to the railroad track; that the warning sign north of the road is distant from the east rail of the track twelve feet seven inches; that eleven feet south of Old Bay Road, and seventeen feet five inches east of the east rail of the track, marks the northeast corner of a shed or garage; that the garage is nine or ten feet wide, and along the length of the track is about twenty-two feet; that from the south end of the garage or shed there is a wire fence extending south for a distance of thirty feet to another small shed or chicken house, about seven feet square; that the distance from the west side of North Point Road to the east rail of the track is one hundred and five feet; that the track at the point of the collision consisted of two rails, T-rail construction, laid on ties, with stone sleepers under the ties, or the same construction as is found in ordinary railroad tracks; that the track is laid upon a private right of way which crosses the highway; that at the southeast corner of Old Bay Road and the railroad track there is located a loading platform of cinder or stone construction, seven feet wide and sixty-five feet long; that between the platform and certain foliage or growth, of the height of three or four feet, near the garage and chicken house, there is an area five or six feet wide, which established a space of possibly twelve or thirteen feet clear from the line of foliage to the street car track, looking from the road in a southerly direction;

the witness stating that there was anywhere from seven to ten feet between the shrubbery on the easterly side of the railroad track, and the track, for a considerable distance, at least 410 feet, south of the crossing. Further testifying, he stated that this condition along the east side of the track existed as far south as the Bay Side Road, which was the next southerly crossing over the track, 953 feet distant, although the plat did not show to that extent, and that, standing in the center of the track, looking south, he could see past the Bay Side crossing, because the road was perfectly straight; that standing on Old Bay Road, in the path of the automobile, on a line with the westerly wall of the garage or shed above mentioned, and seventeen feet from the street car track, with conditions substantially the same, as far as sight was concerned, as they existed on the day of the accident, his view was unobstructed along the street car track to the southward for a distance of 200 feet. Other measurements taken by the witness, and photographs identified by him, designed to show a longer unobstructed view south of the crossing, from a point at or near the point at which the appellee's automobile is said to have been stopped, were offered in evidence; but as the photographs were taken from another automobile, and the difference in dimensions between the automobile in which they were taken and the appellee's automobile is not definitely shown, we will not discuss them.

John E. Metzbower, claim investigator of the appellant, testified that on March 2nd, 1937, with the same street car, over a course 1320 feet south of the south side of Old Bay Road, with the start 300 feet below the course, and with the operator operating the car to its full power, the maximum speed obtained was 25.3 miles per hour. Two other similar tests, made on the same day with a 700 foot start, developed a maximum speed of 27.3 miles per hour.

Finally, Allen Blosse, the motorman in charge of the street car at the time of the accident, testified that when the car was approaching Bay Side crossing, which, as

has been stated, was 953 feet south of the scene of the collision, he blew the regular signal of two long and two short whistles; that, after he passed Bay Side crossing, he fed up his controller, got the car under good headway, and then cut the power off and let it drift at a speed of fifteen miles per hour; that there is a whistle post 250 feet north of the Bay Side crossing, and at that point ne blew the same signal and slowed down the car for the crossing in question "in case anything should happen to come out in front" of the car. He described the landing platform for northbound traffic at the Bay Shore Road crossing as being ninety feet long and extending along the track from the south side of the Bay Shore Road; when he reached this platform his signal was blowing, and he estimated his speed to be between ten and fifteen miles an hour. He saw through the space to his right, between the garage and the chicken house, the appellee's automobile rapidly approaching the railroad; and the appellee did not seem to be looking either to his right or left; whereupon he blew his whistle again, and the whistle was blowing at the time of the accident. He estimated that when his car was practically up to the crossing, the automobile was ten feet east of the rail, and the driver was attempting to cross at a good speed. He applied his emergency brakes and the collision took place, almost simultaneously. His brakes became locked from the force of the impact, causing the air pipes attached to them to burst; whereby' he lost control of the car.

The testimony of the witness Blosse was substantially corroborated by that of Mason C. Lucas, the conductor on the car at the time of the accident; these two being the only occupants of the car at that time. Lucas stated that when he first saw the automobile, the street car was proceeding at ten miles an hour, and the automobile was from ten to twenty feet east of the track, the car being at the time from fifteen to twenty feet from the south side of the crossing. Testimony was adduced by the appellant to the effect that there were no passengers

on the landing platform waiting for the car, and that the custom of running the car was to slow up upon approaching stations along the route, and, upon ascertaining that there was nothing to stop for, to speed up without stopping at the station.

Upon the close of the testimony, the appellee submitted four prayers, all of which were granted; and the appellant submitted twenty-one prayers, fourteen of which were granted and seven rejected. The appeal is from a judgment entered in The Baltimore City Court upon the verdict of a jury in favor of the appellee; and the exceptions in the record include nine to the rulings of the lower court on evidence, and one to its ruling on the prayers.

In the view we take of this case, it will be necessary only to consider the refusal of the court to grant the appellant's B prayer, which asked for an instructed verdict in its favor on the ground of contributory negligence. In order to determine the correctness of the ruling of the lower court in rejecting this prayer, it becomes necessary to examine all the evidence presented by the record; and, before doing this, it is proper to state that the law, as declared by this court and supported by the great weight of authority elsewhere, is that to justify reversal of the ruling of the trial court with reference to the prayer now under consideration, namely, on the ground of contributory negligence by the appellee, the evidence must show some prominent and decisive negligent act on the part of the appellee which directly contributed to the accident and was the proximate cause thereof, and such negligent act must be of such prominent and decisive character as to leave no room for difference of opinion thereon by reasonable minds. *Balto. & Ohio R. Co. v. State, use of Hendricks,* 104 Md. 76, 84, 64 A. 304; *Cooke v. Traction Co.,* 80 Md. 551, 558, 31 A. 327; *Taxicab Co. v. Emanuel,* 125 Md. 246, 93 A. 807; *Merrifield v. C. Hoffberger Co.,* 147 Md. 134, 136, 127 A. 500; *Askin v. Moulton,* 149 Md. 140, 131 A. 82; *Lozzi v. Pennsylvania R. Co.,* 152 Md. 508, 137 A. 293;

*Barker v. Whittier*, 166 Md. 33, 170 A. 578; *Glick v. Cumberland & W. Elec. Ry. Co.*, 124 Md. 308, 92 A. 778; *Crystal v. Baltimore & Bel Air Ry. Co.*, 150 Md. 256, 132 A. 629. In *Taxicab Co. v. Emanuel, supra,* it is said page (813) : "The act relied on to establish, as a matter of law, the existence of contributory negligence must be distinct, prominent, and decisive, and one about which ordinary minds would not differ in declaring it to be negligent"; and, as said in *Lozzi v. Pennsylvania R. Co., supra:* "That question must be considered in the light of all the inferences favorable to the plaintiff's case which may be fairly deduced from the evidence, and with due regard to the presumption that he exercised ordinary care. *Burke v. Baltimore*, 127 Md. 561, 96 A. 693; *Balto. & O. R. Co. v. Stumpf*, 97 Md. [78] 91, 54 A. 978; *Hopper McGaw & Co. v. Kelly*, 145 Md. 170, 125 A. 779."

Measured by this statement of the law, the instant case presents a state of facts in which a street railway line traverses a section of comparatively open country, and it necessarily follows that it is not there restricted in the speed of its cars to the same degree as when operating within the confines of a congested city area. In a similar situation this court, in considering an accident occurring at a public crossing over a private railway located in a suburban section, said, with reference to the action of the injured parties: "They were in a suburban section where the construction of the electric railway prevented its being used as a part of the highway, except at those intervals where crossings had been made for travel on intersecting streets, and where for this reason and because of the nature of suburban railway service, the rate of speed is much higher than that allowed in the city and the probability and danger of collision on a suburban railway crossing are, therefore, much greater, and, consequently, more caution is exacted of those crossing the railway track." *Crystal v. Baltimore & Bel Air Ry. Co., supra* (132 A. page 632), and cases therein cited.

By the appellee's own testimony, he was well ac-

quainted with the crossing and the surrounding sections of country. In the course of his journey, culminating in the accident, he had paralleled the railroad a short distance to the east of it, for apparently an appreciable distance. He made the turn into the highway which crossed the railroad, according to his testimony, at an exceedingly low speed, and at a point eighty feet distant from the east rail of the track, which latter distance was actually measured as being one hundred and five feet by the engineer of the appellant. He was cognizant of the warning "stop, look and listen" sign, and testified that it was a slight distance to the rear of where he sat as he stopped his car so as to bring its radiator within three and a half or four feet of the east rail of the track.

Ignoring the testimony adduced by the appellant tending to show that at that point the appellee's view in the southerly direction of the track was at least 100 and perhaps 200 feet by actual measurement, the appellee admits that he then had an unobstructed view of the track to the south of where his car was stationed, for a distance of 100 feet, and a like view towards the northern section of the track for a distance of 400 or 500 feet. In this situation, according to his testimony, he looked to his left, and, seeing or hearing nothing, looked to his right; and then, after ascertaining that he was entirely safe from any danger of an oncoming car to his right, proceeded to cross the track without looking, as he states, again to his left. It should be borne in mind that he had his car at that instant under control, that the grade was practically level with the track, and that, had he looked or even listened, it would have been a practical impossibility for him not to have both seen and heard the approach of the car in time to have remained in his place of safety. Furthermore, there is testimony in the record of one of his witnesses, namely, Labuda, who appears to have had the advantage of both the side and front view of the scene of the accident, as follows: "I saw Mr. Lewis' automobile make the turn from North Point Road into Old Bay Road, heading for the car

track, and then he came up and stopped with the front end of his automobile about three or four feet from the nearest rail of the railroad track. Then I saw him start over the track, and it was at that moment that I noticed the street car forty-four feet away, and Mr. Lewis kept on going, and the automobile had not gotten any more than on the track when it was struck." As was said in *Glick v. Cumberland & W. Elec. Ry. Co., supra* (92 A. page 780): "That a railroad track is a signal of danger, and that one attempting to cross it must, in order to avoid the imputation of negligence, first look and listen, and, if the view be obstructed, stop, look, and listen for an approaching car, is a principle too firmly rooted in the law of this state to admit of any further question. It expresses the fixed standard of necessary caution and care, and has for its object the protection not only of those who travel on the public roads, but also those who require the service of steam and electric cars. In the case of *Philadelphia, W. & B. R. Co. v. Hogeland,* 66 Md. 149, 7 A. 105, the late Chief Judge Alvey, after referring to the duty of railroad companies, said: 'But while such is the plain duty of the managers of railroad trains, it is equally the duty of those approaching the crossings as travelers on the highways to approach with care, and the more difficult and dangerous the crossing, the greater the care required. The rule is now firmly established in this state, as it is elsewhere, that it is negligence *per se* for any person to attempt to cross tracks of a railroad without first looking and listening for approaching trains; and, if the track in both directions is not fully in view in the immediate approach to the point of intersection of the roads, due care would require that the party wishing to cross the railroad track, should stop, look, and listen, before attempting to cross. * * * And if a party neglect these necessary precautions, and receives injury by collision with a passing train, which might have been seen if he had looked, or heard if he had listened, he will be presumed to have contributed, by his own negligence, to the occurrence of the accident;

and, unless such presumption be repelled, he will not be entitled to recover for any injury he may have sustained. This is the established rule, and it is one that the courts ought not to relax, as its enforcement is necessary as well for the safety of those who travel in railroad trains as those who travel on the common highways.' "

In line with the testimony of the appellee that no signal was given by the motorman, it would place an unusual strain upon the imagination to hold that the appellee could hear no noise from an empty trolley car approaching at an excessive speed within the distance which it was physically necessary for the car to have been in order to cause the accident, before he started the automobile across the track. In addition to this fact, regardless of the growth which, according to the appellee's testimony, obstructed his view beyond a distance of 100 feet to the south, it would seem unreasonable to conclude that a trolley attached to a wire strung from poles thirty feet high along the track would not have been observed approaching him, even though the body of the car was not visible. It is apparent from the uncontradicted testimony that, if the appellee had walked from his standing car but a few feet, his vision to the south of the crossing would have been at least equal to that which, from his seat, in the car, he possessed to the north of the crossing. It cannot be questioned that he had the advantage of this opportunity, and that the uncertainty of the situation which, according to his own testimony, confronted him, made it incumbent upon him to settle that uncertainty on the side of safety. *Mehring v. Pennsylvania R. Co.,* 158 Md. 310, 148 A. 459; *Glick v. Cumberland & W. Elec. Ry. Co., supra.* As was well said in the case of *New York Central & H. R. R. Co. v. Maidment* (C. C. A.), 168 Fed. 21, 25: "The duty of an automobile driver approaching tracks where there is restricted vision to stop, look, and listen, and to do so at a time and place where stopping, where looking, and where listening will be effective, is a positive duty,

and these safeguarding steps the plaintiff failed to take. He stopped where stopping served no purpose. * * * He made chance, and not sight, the guarantee of his safety." In *McNab v. United Rys. & Elec. Co.*, 94 Md. 719, 51 A. 421, it is said: "Contributory negligence is simply negligence, and is, like primary negligence, relative, and not absolute; and being relative, it is dependent on the peculiar circumstances of each particular case. There are many acts which would not be negligent when done under some conditions, though the same acts, if done under different conditions, might be highly negligent. And this is equally true of contributory negligence. So, ultimately, in every case of this character, it becomes necessary to view the entire surroundings to determine whether either primary or contributory negligence has been established." We are not to be construed, in applying the latter principle of law to the facts in the instant case, as holding that in every case it is the duty of an automobilist, upon reaching a railway crossing, to leave his car and avail himself of the view of the track both ways before driving across, because, as noted above, the solution of the question "is dependent on the peculiar circumstances of each particular case." In our opinion, the instant case is somewhat analogous to the cases of *Siejak v. United Rys. & Elec. Co.*, 135 Md. 367, 109 A. 107, and *Balto. & O. R. Co. v. Goodman*, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, and is not controlled, as urged by the appellee, by the case of *Pokora v. Wabash Ry. Co.*, 292 U. S. 98, 54 S. Ct. 580, 78 L. Ed. 1149, in which the accident took place in a congested city area, where the route of the plaintiff led over four parallel tracks of the defendant company, and where necessarily trains were likely to have been moving in both directions at the same time.

In our opinion, therefore, there was error in the refusal of the trial court to grant the appellant's B. prayer, and accordingly the judgment will be reversed.

*Judgment reversed, without awarding a new trial; appellee to pay the costs.*