IN RE APPEAL NO. 769, September Term, 1974
FROM THE Circuit Court of Baltimore City,
SITTING AS A Juvenile Court

[No. 769, September Term, 1974.]

*Decided April 7, 1975.*

The cause was argued before ORTH, C. J., and DAVIDSON and LOWE, JJ.

*Solomon Reddick, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* on the brief, for appellant.

*Martin M. Mrozinski, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City* and *Clarence Long, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

The keystone of the democratic system under which the peoples of this country have elected to be governed is that no person shall be deprived of life, liberty, or property, without due process of law. This tenet was ordained and established by the people of the United States in amendments to the Constitution of the United States,[1] and declared by the people of this State in the Declaration of Rights to the Constitution of Maryland.[2] It is a doctrine broad in concept but clear in meaning.[3] It transcends the separation of powers and applies with equal force to the executive, legislative and judicial branches of our government. It is

---

**1.** Amendment V: ". . . nor shall any person be . . . deprived of life, liberty, or property, without due process of law;. . . ." Amendment XIV: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law;. . . ."

**2.** Article 23: "That no man ought to be . . . deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." *See* Horace Mann League of the United States of America, Inc. v. Board of Public Works, 242 Md. 645; County Commissioners v. English, 182 Md. 514.

**3.** For a discussion of the meaning of due process of law see Hurtado v. California, 110 U.S. 516.

buttressed by other constitutional guarantees and prohibitions, implemented by statutes enacted and fulfilled by rules adopted. It is judicially to be administered by courts of justice.[4] In this case, due process of law was smutched by the proceedings below.

## I

This appeal stems from a proceeding against a child [5] in the Circuit Court of Baltimore City, Division for Juvenile Causes (Juvenile Court). On 25 September 1974 there was an order issued by that court which recited that the respondent child had been found delinquent by reason of breaking and entering and that such delinquency had resulted in a monetary loss of $1000 to the victim of the delinquent act. The court ordered ". . . that [name and address of child's mother] parent of said respondent shall make restitution in the amount of $1,000 — One thousand dollars and no cents to the said [name and address of the victim]. All subject to further Order of the Court." On 16 October, Solomon Reddick, Esq., Assistant Public Defender, filed an "Order for Appeal", directing the Clerk to enter an appeal "from the judgment and order of restitution in the above captioned case [the juvenile proceeding against the child]."[6]

## II

The order before us for review set out that it was "in accord with Section 71A, Art. 26 [Annotated Code of Maryland — 1957 Edition]." Article 26 was repealed by Acts 1973, 1st Special Session, ch. 2, § 2, effective 1 January 1974.

---

4. Regents of the University of Maryland v. Williams, 9 Gill & Johnson 365.

5. See Maryland Rule 1097.

6. The Juvenile Court issued an order on 21 October 1974 purporting to be upon a petition by the child "together with the oath in forma pauperis" filed by the child. The court ordered that costs of appeal be paid by the State and appointed Mr. Reddick to prosecute "the said appeal on behalf of the Defendant [the child]." It appears, however, that the actual appellant is not the child, but his mother. In any event, on 23 October 1974, the Office of the Public Defender filed a Notice of Appearance, requesting the Clerk to enter the appearance of Mr. Reddick "for the Appellant in the above entitled case."

The law applicable was enacted by Acts 1973, 1st Special Session, ch. 2, § 1, codified as Courts Art. § 3-839.[7] It was amended by Acts 1974, ch. 691, § 8, effective 1 July 1974. The section is entitled "Liability for acts of child", and it provides:

"(a) *Award of judgment against parents.* — In any juvenile cause, the judge may award a judgment in favor of a wronged person and against a parent for the acts of willful or malicious destruction or theft of any property owned by the wronged person, or any medical expenses incurred by an injured person willfully or maliciously caused or committed by the child of that parent.

(b) *Restitution by parent.* — The judge may order the parent to make restitution to the person whose property has been destroyed or stolen, or who has incurred the medical expenses, and may cite for contempt for a violation of his order if the facts of a particular case before him indicates sufficient ability of the parent to comply with the order.

(c) *Limit of parent's liability.* — The limit of the parent's liability for all damages including medical expenses under this section may not exceed $1,000.

(d) *Restitution by child; liability of child precedes liability of parent.* — The court may order the child who willfully or maliciously destroys or steals property or willfully or maliciously injures another to make restitution or pay the medical expenses himself if that is feasible considering the age and circumstances of the child; and if this is ordered, the liability of the child precedes the liability of the parent."

The legislative intent is clear. In any juvenile cause, parents

---

7. According to the Revisor's Note the section is new language derived from Art. 26, § 71A, as amended by ch. 651, Acts 1973. There is no substantive difference between the statute as revised and the repealed statute.

may be held liable for acts of their child under specified conditions.

I. There must be legally sufficient proof
   (1) that the child
      (a) destroyed property; or
      (b) stole property; or
      (c) injured a person; and
   (2) that the acts by the child were
      (a) willful; or
      (b) malicious; and
   (3) that the wronged person suffered pecuniary losses in a certain amount as a result of the child's acts.

II. Upon such proof, a juvenile court may, in an amount equal to such damages proved or in the amount of $1,000, whichever is the lesser, and without regard to the ability of the parent to pay
      (a) award a judgment in favor of the wronged person and against a parent; or
      (b) order a parent to make restitution to the wronged person; or
      (c) both award such judgment and order such restitution; and
      (d) order the child to make restitution if that is feasible considering the age and circumstances of the child; and
         (i) upon such order the liability of the child precedes the liability of the parent.

III. Upon violation of an order that a parent make restitution, the juvenile court may cite the parent for contempt if the facts of the

particular case indicate sufficient ability of the parent to comply with the order.[8]

In *Matter of Sorrell,* 20 Md. App. 179, *cert. den.,* 271 Md. 744, we considered the procedures by which a juvenile court may properly exercise the powers bestowed by Courts Art. § 3-839. We thought that to satisfy constitutional requirements the powers must be exercised in accordance with the provisions of Maryland Rule 922 and what was then Code, Art. 26, § 70-22, and is now Courts Art. § 3-837.[9] Rule 922, § a provides that a juvenile court may control the conduct of a person who is properly before it in accordance with Courts Art. § 3-837. Section b of the Rule concerns notice. It directs the clerk to "issue notice of a hearing setting forth in concise language the nature of and the grounds for the relief requested." It requires that the notice shall be served by personal service or registered mail, not less than two days before the hearing, upon the parties affected by the relief sought, unless such notice is waived. Courts Art. § 3-837 authorizes a juvenile court, pursuant to the procedure provided in the Maryland Rules, to make an appropriate order directing, among other things, a person properly before it, to make restitution if:

(1) an order of disposition had been duly made; and

(2) the court finds that such action will provide reimbursement of costs, expenses, or restitution; and

(3) notice has been given as prescribed by the Maryland Rules.

We dealt with the nature of the hearing and the

---

**8.** " 'Child' means a person under the age of 18 years who is subject to the jurisdiction of the [juvenile] court, and includes a minor." Courts Art. § 3-801 (e).

" 'Property' means property of the state, any county, municipal corporation, or other political subdivision of the state, or any of their units, or an individual, receiver, trustee, guardian, executor, administrator, fiduciary, or representative of any kind, or any partnership, firm, association, public or private corporation, or any other entity, including the federal government and any of its agencies." Courts Art. § 3-801 (w).

**9.** According to the Revisor the only changes were in style.

requirements of its conduct. We indicated that there should be a charging document filed against the parent. We found it manifest that in the case reviewed "the trial court had concluded, erroneously we think, that entry of judgments under Article 26, § 71A flowed inevitably from the prior determination that the juveniles were delinquent." 20 Md. App. at 191. We held that "a judge exercising jurisdiction under that statute may act only after a hearing under Rule 922, wherein evidence is produced that is legally sufficient to support a conclusion that damages authorized by it were willfully or maliciously caused by or committed by a child under eighteen years." We said flatly, "The mere finding of delinquency of the juveniles does not provide such evidence." *Id.* We found it "plain that factual findings wholly adequate to support a finding of delinquency [or a finding that a child is neglected, dependent, or in need of supervision] will not necessarily support the statutory requisites for imposition of judgments against [and orders for restitution by] parents." *Id.* We explained that a parent is not a party at the delinquency hearing of the child,[10] and that such a hearing was clearly not the forum wherein they were to defend themselves against liability for restitution or reimbursement. We asserted: "Such an issue was neither presented to nor controlled by the delinquency hearing." *Id.*, at 192.

We make two further observations. A parent is entitled to representation by legal counsel at a hearing to determine that parent's liability. Courts Art. § 3-830 (d). See Courts Art. § 3-801 (u). The rules of evidence applicable to civil cases shall apply at such hearings. Rule 912, § c.

### III

The order for restitution issued 25 September 1974 was preceded by a hearing the same day before the judge of the

---

10. A juvenile court has exclusive original jurisdiction over an adult who is charged with committing a willful act or omission causing a child to be adjudicated neglected, delinquent, or in need of supervision. Courts Art. § 3-805 (a). An adult so charged may elect to be tried either in the juvenile court or in the criminal court according to the usual criminal procedure. Courts Art. § 3-805 (b).

Juvenile Court. In order to understand what transpired at the hearing, it is necessary to look at what had previously taken place. We shall attempt to do so with as much certainty as the record permits.

We assume that there was a proper finding that the juvenile here involved was a delinquent child.[11] We start then with a 9 April 1974 docket entry and a notation on the back of the petition filed, stating the Juvenile Master ordered: "Study and Report by the Probation Department to determine restitution — Disposition to be set in when companion cases are heard." On 11 April a Deputy Clerk of the Juvenile Court wrote the owner of the broken dwelling informing him that the child had appeared before the court on 9 April and "admitted the offense and thus no formal Court hearing will be necessary." The letter suggested: "If you have suffered a monetary loss and wish the Court to consider the possibility of restitution or have information that you feel should be presented to the Court, please contact this child's Probation Officer (whose name and telephone number was set out) within two weeks of the above date of the hearing." There was a hearing before the Master on 9 May. According to the docket entry and notation on the petition, the Master ordered that disposition be postponed for further investigation. The Master wrote a "Memorandum" under the same date to the Clerk of the Juvenile Court stating that the case had come before him on 9 May for a disposition. The Master said that the matter of restitution was "of vital importance to the victim" and that the probation officer has presented an itemized list showing that the actual losses amounted to $4275, of which $784 had been paid by an insurance company. The memorandum stated that notice had been given to Solomon Reddick, Esq., a public defender attorney, that the next hearing before one of the masters "will be a restitution hearing to determine the responsibility in this case of the parents of the other co-defendants."

---

11. The propriety of the finding that the child was delinquent is not before us. We make the assumption *arguendo* that such a finding was duly arrived at after a proper adjudicatory hearing.

The next docket entry is under date of 5 September 1974. It reads:

"Hearing before Master Rifman
Order: Probation to the Department of Juvenile Services and restitution of $1,000.00."

This entry is obviously made from a notation on the back of the petition reading: "Probation to Department of Juvenile Services and restitution of $1,000.00."

On the same date, the Master made a report of the case to the judge of the Juvenile Court:

"The above matter having been assigned for hearing before me, and the hearing having been had this date in which the evidence disclosed the Respondent to be a Delinquent child in need of care and treatment and, therefore, within the jurisdiction of this Court, it is recommended that the following Order be passed."

An "Order for Probation" was set out on the bottom portion of the "Master's Report." It read:

ORDERED this 5th day of September 1974 that the Respondent having been found to be Delinquent and in need of care and treatment he is hereby placed on probation under supervision of a Probation Officer of this Court.

While on probation the probationer shall refrain from further delinquent behavior; shall avoid persons and places of disreputable or harmful character; shall report as directed and obey the instructions of his Probation Officer; shall not leave the jurisdiction without permission and shall comply with other conditions as specified below or may at any time be imposed by this Court."

The order was signed by the judge and noted that it was filed on 5 September 1974, with "Copy served on parent." [12]

---

12. The Report and Order consisted of a printed form, designated as "DJS-1708-9 '71", with blanks to be completed.

The same day there was filed a document entitled "ORDER FOR RESTITUTION FOR PARENT OR GUARDIAN" signed by the judge. Except for the date, it was identical with the order subsequently issued on 25 September 1974.[13]

On 6 September 1974 an "Exception to Order for Restitution" was filed by Charles Allan Finebloom, an Assistant Public Defender. It was captioned: PETITION NO: 013025 EX PARTE IN THE MATTER OF [child's name]." Directed to the Clerk, it read:

> "Pursuant to Rule 908 (e) (2) of the Maryland Rules of Procedure, please be advised that the Office of the Public Defender, on behalf of the above Respondent, excepts to the finding of Master Rifman, on 9/5/74 in the above captioned Petition(s) and request the matter be re-set for a hearing before the Judge of this Honorable Court."

On 9 September 1974 the Deputy Clerk of the Juvenile Court, by letter, informed the State's Attorney that exceptions had been filed and that his office would be notified as to the hearing date. On 16 September the Juvenile Court Services Division notified the District Public Defender of Baltimore City that the child had requested representation, and that there would be a hearing before Judge Hammerman "(except to restitution)" on 25 September 1974 at "1:30".

With this background, we look at the proceedings of 25 September 1974.[14] The bailiff had the child stand and read him the charge in the petition. The Judge asked Mr. Finebloom if he represented "the Respondent", patently meaning the child, and Mr. Finebloom said that he did. The transcript reads:

> "THE COURT: Now, do I understand, Mr. Finebloom that the posture of this case this afternoon

---

**13.** The pertinent parts of the order of 25 September 1974 are set out in Section I of this opinion.

**14.** Clarence Long, Jr., Esq. appeared on behalf of the State. Charles Finebloom, Esq. appeared on behalf of the Respondent.

is that on April the 9th, 1973, [15] before Master Rifman, the Respondent entered an admission to this charge and was found delinquent? And after an investigation and study by the probation department on September the 5th of this year Master Rifman placed the Respondent on probation and ordered restitution against the boy?

MR. FINEBLOOM: Restitution against the parent, Your Honor.

THE COURT: Against the parent in the amount of one thousand dollars and that on the following day an exception was filed by your office as to the restitution order only?

MR. FINEBLOOM: Yes, Your Honor.

THE COURT: And this is why we are here this afternoon; is that the correct posture of this case, Mr. Finebloom?

MR. FINEBLOOM: That is correct."

The Assistant State's Attorney informed the court that the victim was present. What next occurred is enlightening and we set it out as reported:

"MR. LONG: Yes, sir. Perhaps I ought to ask a question about the ground rules never having participated in a restitution per se in court.

THE COURT: Well, I never have either as far as the exception so we're all new to the game.

MR. LONG: I assume the State will not have to prove the involvement of this —

THE COURT: Not at all.

MR. FINEBLOOM: Your Honor, may I address myself to that?

THE COURT: Yes."

---

15. The proceedings conducted by the master were on 9 April 1974, not 9 April 1973.

Mr. Finebloom discussed, correctly, our holdings in *Matter of Sorrell, supra.* The judge said he was in agreement but that the question before him was whether "the State has to prove that the Respondent committed the act that he is charged with committing." His answer to that "was no and it is still no." He explained:

> "First of all, he admitted to the charge. There is no need really for proof, he admitted to it. But, even if he hadn't — even if he had denied it and there was a full adjudicatory hearing and he was found delinquent, the State does not have to prove his guilt any more. What the State does have to establish and what the Sorrell case says is that it must be a determination that there was willfulness or maliciousness in the damage or loss incurred, and that is the case here. I have to be able to make a finding that what this Respondent was involved in had the element of willfulness or maliciousness, that's true."

After further argument concerning the need of proof by the State of the extent of the child's involvement, the judge said:

> "Well, now, you're just going around the same mulberry bush again; there has to be an establishment of willfulness or maliciousness. Now, how the State chooses to go about it is their decision. You know what constitutes maliciousness, what constitutes willfulness. Is the fact that the other boys may have done more damage than he did means there is no maliciousness or willfulness on his part and you're free, of course, to argue that there was no willfulness or maliciousness."

Shortly thereafter the judge had occasion to comment further on his view regarding proof of willfulness and maliciousness:

> ". . . I don't think the law is that the State has the burden of proving willfulness and maliciousness

because an order of restitution can be sought by the State or it can be a sua sponte proposition also and I think that all that is required is that the Court, whether it be by petition of the State, by sua sponte that the Court must be able to establish in the record that there is some willfulness and maliciousness; but the burden of proving that doesn't rest with the State's Attorney. The State has the option, if it wishes, to try to show some willfulness or maliciousness but the State can remain moot and not even be present at the hearing and still I could find willfulness and maliciousness perhaps. I just wanted to clarify where the burdens of proof lie."

Immediately preceding these last remarks the court directed the State to proceed. The State could not do so. The Assistant State's Attorney said:

"Frankly, Your Honor, the State today is only prepared to go forward with that testimony which would establish the degree of damage to the victim. We have to rely on the court records to show willfulness and maliciousness and, from the nature of the crime, he has admitted to burglary in this case. We feel that per se the case is maliciousness and willfulness. We do not have the direct testimony of the — from the Officer that caught him."

The State's lack of preparedness was simply resolved. The judge directed that the State read an "offense report" into the record." The Public Defender objected and was summarily overruled. Over further specific objection by defense counsel, the court directed the State to "take all the offense reports and make them a part of the record in this proceeding . . . . So, they will be a part of the record." It then told the Assistant State's Attorney to "read those portions that you feel are relevant." Specific objection was again made and overruled. The Assistant State's Attorney

did as directed. What he read included a portion of an offense report which he observed made "no specific reference to this particular burglary" but asserted that the juvenile had been taken into custody and, "after being advised of his rights, admitted to committing these offenses while in company with subjects indicated", and that he turned over to the officer a revolver, holster and ammunition taken in "complaint number 6J36546". The State suggested that a revolver had been taken in the breaking which was the subject of the proceeding before the court. The court then requested the State to read "the original offense report of these burglaries." The State did so. The report recounted in detail what the victim had told the police and what the police had ascertained:

> "Complainant stated . . . he left his home at 1830 hours, 2 October 1973. When he returned at 2355 hours he found the door located on the side of the house — apparently that means the door was opened. It was located on the side of the house. Upon investigation, I found that the entrance had been gained by breaking a pane of glass six inches by 12 inches, located approximately three feet from the floor and unlocking the door. Suspect further had to unlock a lock located on the bottom of the door. Persons unknown then entered various rooms in the home and took the above described property.
>
> I advised the complainant to make a complete list of the missing property and recontact the police."

According to the State "a later offense report" gave "a complete list of all the property that was allegedly taken." The court called a bench conference, at the conclusion of which it was stipulated that the loss sustained by the victim totaled $4275.[16] The court asked if the State wished to be

---

16. In open court the State attempted to explain how this amount was determined. It said that the actual loss was $4558 of which $314 was recovered. "That, I think, is where the probation officer gets his total figure." We note that the master gave the loss as $4275, and that an actual loss of $4558 less $314 leaves $4244, not $4275. The State continued that

heard further "on the subject of what restitution if any should be ordered by this Court?" The State neither offered nor proffered any evidence. It simply declared: "There were originally four people charged in this offense, including the Respondent. Three [all juveniles] have been found delinquent. The other individual was dismissed by the State. . . . Presumably that means we could reopen the case but I suspect that we'll not do so." The State felt "that the remaining loss should be divided three ways." It figured that each juvenile should pay $1152.[17] The court observed that this was more than the law allowed.

Defense counsel argued strenuously that the State had not produced evidence sufficient to make a determination that an order of restitution under the statute should be issued against the parent. He pointed out that the State was notified of the hearing and that summonses were sent. "The State's Attorney has a detective and an officer involved in this case; a detective who investigated the case, who was the primary sponsor of the offense report and we submit that that is the evidence that the Sorrell case is talking about when it is talking about legally sufficient evidence to support a finding in a restitution hearing." He complained that the offense report, which he challenged, was not such legally sufficient evidence. He argued the court must consider "the involvement and the degree and extent of involvement of this Respondent" when passing an order of restitution against his parent. He urged that no evidence "has been produced to show that the act committed by the Respondent was a wilful or malicious act. There has been no testimony at all regarding this offense either that goes to

---

according to the victim he had received "insurance in the amount of seven hundred and eighty-nine dollars." (The Master said it was $784). We note that deducting this amount leaves $3455. The State added that the victim "also wished me to inform the Court that that is a subrogated claim and he may have to repay a proportional amount of that. I informed him that it would be up to Your Honor as to whether Your Honor wants to consider the insurance company in this matter." The court said: "All right, that takes care of determining the amount of the loss [apparently in the stipulated amount of $4275]."

17. Patently this is based on a total loss of $3456.

wilfulness or maliciousness or degree of involvement. Nothing legally sufficient in law to support a finding of an order of restitution against his parent." Defense counsel iterated and reiterated his argument, making his points abundantly clear. He indicated that he had an itemization of the mother's income and expenses — "she's a nursing technician at Saint Agnes Hospital." It is manifest from the transcript of the proceedings that defense counsel began his argument at the invitation of the court — "Mr. Finebloom, you wish to be heard at this time?" — after the State had rested its case. In effect, he was arguing a motion to dismiss. Rule 535. The court did not look at it in that light. When defense counsel referred to the statement of the mother's income and expenses, the court asked if he wanted to introduce it into evidence. Defense counsel thought that the proceedings had not yet reached that point, and said so several times, but the court insisted that the defense had rested its case: "You say you haven't got to that point, you rested, what other point are we getting to?. . . . If you are not going to bring it in now, when are you going to bring it in. . . because you rested your case." [18] Defense counsel was left with no alternative but to offer the statement of income and expenses. It showed a monthly take home pay of $480, debts of $15,801 and monthly expenses for payments on the debts, utilities, and food of $474. The court examined the mother at length with regard to the statement. The court ruled:

> "I'm going to pass an order at this time against you ordering you to pay the sum of one thousand dollars by way of restitution to [the victim] through the probation department on an installment schedule as the probation department will set up for you.
>
> I find that not only did your son commit the burglary of these premises but that he did so willfully and maliciously. I indicated at the outset

---

**18.** We cannot find in the transcript that the defense had "rested" its case.

that the State has no burden of proving anything really. Counsel argues that the State didn't present anything regarding willfulness or maliciousness and that is true. But, as I said at the outset of the hearing, what the law requires is that the Court be able to establish that there was a willfulness and maliciousness in the loss here — in the act committed by the Respondent that led to the loss and not that the State has to prove it, but that the court find it to be and I find it to be.

I think that the offense reports are clearly admissible in this type of hearing. We are not talking about an adjudicatory hearing, we're talking about a separate hearing just on the matter of restitution."

The judge then recounted the circumstances of the crime as related in the offense report. He noted that the juvenile had "fully admitted his guilt in this" and then referred to a "social history" prepared by the Probation Department, "which is a part of the record in this case" and which was presented to the Master upon his order after the adjudication. He read from that report what the juvenile had said concerning his participation in the crime, fully inculpatory. He used this confession as the basis of finding "a clear willfulness in perpetrating this crime." He opined that the extent of the loss showed "a severe maliciousness." He interpreted the *Sorrell* teachings in the light of the factual background of that case as he remembered it and distinguished *Sorrell* factually. We do not find the distinction to be sound.

The court questioned the mother on her ability to pay.[19] He concluded she should make restitution. He explained his position:

"Believe me I have nothing in the world against [the mother]. From all I know and from reading the

_____

**19.** The transcript does not indicate that the mother was sworn as a witness.

reports, she's a very fine, substantial woman, an exemplary woman. I don't want to see any hardship imposed upon you, none whatsoever, but the law says that restitution can be ordered in the situation. Her son did commit the crime or this delinquent act and in trying to match her interests as against the interests of [the victim], they are both meritorious, but, I feel in the balance of things that he should be made as whole as we can possibly make him. As far as I'm concerned the burden should really rest on [the juvenile]. He's the one who did it, not his mother, and I think anything his mother will have to pay he ought to eventually, sooner or later, pay it back to his mother, if he has any sense of decency or good conscience and if I can be presented by defense counsel, either today or at some subsequent time, with any plan whereby the order of restitution can be lifted from the mother and transferred to the Respondent where he would be — and I say viable which means there is some ability for him to make the payments — I would be delighted to transfer the burden legally on his shoulders and remove it from his mother's shoulders.

This Court can, as a condition of probation, order restitution by a Respondent and nothing would please me more than to be able to shift the responsibility to where it morally belongs."

He told the mother that failure to obey the order to make payments as called for by the Probation Department "will result in your being brought into Court for contempt of Court, which will subject you to a prison sentence if you are found guilty of contempt which you will be if you don't make the payments."

We have set out the circumstances under which the order of restitution was issued in such detail to give the sense of its ineffable quality. We find no basis whatsoever to support the conception that the order for restitution was entered "by

the Law of the land." To put it another way, it is manifest that the order deprived the mother of her property without due process of law.

The record does not reflect that there was notice of the hearing issued by the clerk setting forth in concise language the nature of and the grounds for restitution which was served on the mother by personal service or registered mail not less than two days before the hearing as required by Rule 922, § b. The mother was present at the hearing, however, and we shall assume, for the purpose of decision in this case only, that notice was waived by her.[20] We shall also assume, only for the purpose of decision here, that she had the assistance of counsel to which she was entitled.[21]

We find nothing in the record with respect to the mother which would serve in the nature of a declaration such as when judgment is sought in a civil case, or of a charging document which would give the mother reasonable information that an order of restitution was being sought. The docket entry under date of 5 September 1974 indicates that the Master ordered restitution of $1,000. This apparently was entered from a notation of that date on the back of the petition: "(Rifman) Probation to Department of Juvenile Services and restitution of $1,000.00." There is no signed order to this effect in the record. See Rule 908, § e 1. Nowhere is it indicated that the Master recommended that the mother was to pay the $1,000. Rule 913, § b provides that the disposition of the case shall be entered on the docket by the clerk. The Committee note to the rule states, "It is contemplated that the disposition order will provide that certified copies are to be furnished by the clerk to all interested persons and agencies." Of course, the order signed by the judge on 5 September 1974 ordering the mother to make restitution, was a nullity as issued before the time to

20. We expressly caution that it does not necessarily follow that the presence at a hearing of a party affected is sufficient to establish an effective waiver of the required notice.

21. As we have indicated, however, counsel was assigned by the Public Defender to represent the child. We express no view as to the authority of the Public Defender to represent a parent in such a proceeding even if that parent is indigent. See Code, Art. 27A, § 4.

except to the Master's findings and recommendations had expired. Rule 908, § e 2. Exceptions were filed the next day, requiring the judge to hear the matter *de novo*. Rule 908, § e 3. See *Matter of Anderson*, 20 Md. App. 31, *affirmed* 272 Md. 85.

It is the conduct of the *de novo* hearing on the matter of restitution to be paid by the mother, however, which gives us great concern. The trial judge was wrong when he ruled that the State did not have to show that the child had committed the acts resulting in the damages to the wronged party, when he said that the State did not have to prove that the acts were willful or malicious, and when he expressed the belief that the burden of proof did not rest with the State, that "if it wishes, . . . the State can remain moot and not even be present at the hearing. . . ." He thought that, delinquency having been determined at the prior proceeding against the child, all that was required was that the judge be able to find willfulness and maliciousness in the record of the juvenile case. The proceeding before the judge was against the mother. She was not a party to the adjudicatory proceeding against the child. The findings of that proceeding were not *res judicata* as to her. See *Davis v. Frederick Board of County Commissioners*, 25 Md. App. 68. As we have indicated, it was necessary that evidence sufficient in law be adduced to establish both that the child had committed the acts resulting in the damages the mother may be required to pay, and that he had done so willfully or maliciously. The judge misconstrued the teachings of *Sorrell.*

Despite his belief, the judge required the State to produce evidence. The evidence admitted to prove that the child had willfully or maliciously committed the acts consisted of "offense reports", the authenticity of which was never shown. See *Fowler v. Benton*, 229 Md. 571, 578. Those reports are not included in the record submitted to us, but the Assistant State's Attorney, at the direction of the court, read into the record such parts of them as he thought relevant. They consisted of what a police officer reported had been told him by the child and by the victim, what contraband a police officer said had been given him by the

child, what an officer said he had found upon investigation, and his conclusions.[22] We are aware of no rule and can conceive of no rationale, in the circumstances under which the offense reports were offered, whereby they were properly admissible. The reports consisted in the main of inadmissible hearsay, in part violated the rule against expressions of opinion, and in part were conclusions. *Holloway v. Eich*, 255 Md. 591, 597-601; *Cogswell v. Frazier*, 183 Md. 654, 661; *Honick v. Walden*, 10 Md. App. 714, 719. We hold that it was error to admit them.

It appears from the judge's comments that he also relied on the admissions of the child in the answer to the petition filed against him. The answer was not part of the proceedings against the mother. Although by Rule 904 a party may file a pleading denying or admitting all or a part of the facts alleged, if no pleading is filed, the parties are deemed to have denied the allegations. The mother filed no pleading in the action against her, and in fact was served with nothing to which to plead.

The short of it is that counsel below was right when he objected to the admission of the offense reports, when he claimed that the evidence was legally insufficient to sustain the order, and when he took exception to the entire procedure followed, and the court was wrong in overruling his challenges. We reverse the order of 25 September 1974 because the court was clearly erroneous. Rule 1086.[23]

> *Order of 25 September 1974 reversed; case remanded for a new hearing with respect to the liability of the parent.*

---

**22.** The record contains copies of summonses issued to the child, the mother and the victim to appear on 25 September 1974, to testify in the case of Pet. 3025-J. No other purpose of the hearing is indicated.

**23.** As we indicated, see note 11, *supra*, the propriety of the finding that the child was delinquent is not before us. We observe, however, that the rules of evidence applicable to criminal cases shall apply to delinquency hearings, Maryland Rule 912, § c, that the allegation of delinquency must be proved beyond a reasonable doubt, Courts Art. § 3-830 (a), and that "[a] child may remain silent as of right during an adjudicatory hearing on an allegation of delinquency and shall be so advised," Rule 917. Matter of Brown, 13 Md. App. 625. See In Re Appeal No. 544, September Term, 1974, 25 Md. App. 26.